PHILLIP A. TALBERT
United States Attorney
VICTORIA L. BOESCH
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Defendant United States of America

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH NICKLES, Individually and as Administrator of the Estate of Joshua Conner, Deceased,<br><br>    Plaintiff,<br><br> v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | CASE NO. 1:23-cv-00328 ADA-SAB<br><br>**UNITED STATES' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>DATE: October 4, 2023<br>TIME: 10:00 a.m.<br>COURTROOM: 1<br>JUDGE: Hon. Ana de Alba |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................2

I.      INTRODUCTION ...................................................................................................2

II.     BACKGROUND ......................................................................................................3

    A.      Yosemite National Park and the 2018/2019 Lapse of Federal Appropriations ...............3

        1.      Yosemite National Park ................................................................................3

        2.      NPS Policy Regarding Safety in National Parks ......................................5

        3.      NPS Contingency Plan for Lapse of Federal Appropriations 2018...........6

    B.      Joshua Conner's December 25, 2018 Incident ...................................................9

III.    LEGAL STANDARD – RULE 12(B)(1) MOTION TO DISMISS FOR LACK OF
        SUBJECT MATTER JURISDICTION ...............................................................13

IV.     ARGUMENT .........................................................................................................14

    A.      The FTCA's Private-Person Liability Standard Divests the Court of
                Jurisdiction ...................................................................................................14

        1.      The FTCA's Private-Person Liability Standard....................................14

        2.      California's Recreational Immunity Statute Bars Plaintiff's Claim ......14

            a.      Conner's Hiking in Yosemite Was a Recreational Activity ...............15

            b.      No Exception to the Recreational Immunity Statute Applies.............15

    B.      The FTCA's Discretionary Function Exception Divests the Court of
                Jurisdiction ...................................................................................................18

        1.      DFE Applies to NPS Decisions About Whether to Close the Park
                During Federal Shutdown ...........................................................................20

V.      CONCLUSION.......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Armstrong v. United States*,
   No. C 07-3793 SBA, 2008 WL 5047680 (N.D. Cal. Nov. 24, 2008) .................................. 16

*Berkovitz v. United States*,
   486 U.S. 531 (1988) ........................................................................................................ 18, 19

*Bolt v. United States*,
   509 F.3d 1028 (9th Cir. 2007) ............................................................................................. 14

*Brownback v. King*,
   141 S. Ct. 740 (2021) ............................................................................................... 3, 13, 14

*Chadd v. United States*,
   794 F.3d 1104 (9th Cir. 2015) ......................................................................................... 18, 19

*Childers v. United States*,
   40 F.3d 973 (9th Cir. 1994) ................................................................................................ 20

*Doe v. Hagee*,
   473 F. Supp. 2d 989 (N.D. Cal. 2007) ................................................................................ 13

*Dreier v. United States*,
   106 F.3d 844 (9th Cir. 1997) ............................................................................................... 13

*F.D.I.C. v. Meyer*,
   510 U.S. 471 (1994) ............................................................................................................ 13

*Gonzalez v. United States*,
   814 F.3d 1022 (9th Cir. 2016) ............................................................................................. 14

*Jachetta v. United States*,
   653 F.3d 898 (9th Cir. 2011) ............................................................................................... 14

*Kennewick Irr. Dist. v. United States*,
   880 F.2d 1018 (9th Cir. 1989) ............................................................................................. 20

*Lam v. United States*,
   979 F.3d 665 (9th Cir. 2020) ........................................................................................... 18, 19

*Mace v. United States*,
   No. 15-cv-04060-LB, 2015 WL 8770677 (N.D. Cal. Dec. 15, 2015) .................................. 15

*Mattice v. U.S. Dept. of Interior*,
   969 F.2d 818 (9th Cir. 1992) ........................................................................................... 15, 17

*Miller v. United States*,
   163 F.3d 591 (9th Cir. 1998) ............................................................................................... 19

*Morales v. United States*,
   895 F.3d 708 (9th Cir. 2018) ............................................................................................... 19

*Nieto v. Ecker*,
   845 F.2d 868 (9th Cir. 1988) ............................................................................................... 13

*Nurse v. United States*,
   226 F.3d 996 (9th Cir. 2000) ................................................................................... 18, 19, 20

*Ravell v. United States*,
   22 F.3d 960 (9th Cir. 1994) ........................................................................................... 15, 16

*Robinson v. United States*,
   586 F.3d 683 (9th Cir. 2009) ............................................................................................... 13

*Rost v. United States*,
   803 F.2d 448 (9th Cir. 1986) ............................................................................................... 16

*Routh v. United States*,
   941 F.2d 853 (9th Cir. 1991) ............................................................................................... 20

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ............................................................................................. 13

*Savage v. Glendale Union High School*,
   343 F.3d 1036 (9th Cir. 2003) ............................................................................................. 13

*Sierra Club v. Whitman*,
   268 F.3d 898 (9th Cir. 2001) ............................................................................................... 13

*Spires v. United States*,
   805 F.2d 832 (9th Cir. 1986) ................................................................................... 15, 16, 17

*Teplin v. United States*, 17-cv-02445-HSG,
   2018 WL 1471907 (N.D. Cal. March 26, 2018) ................................................................ 19

*Terbush v. United States*,
   516 F.3d 1125 (9th Cir. 2008) ....................................................................................... 19, 20

*Tosco Corp. v. Communities for Better Environment*,
   236 F.3d 495 (9th Cir. 2001) ............................................................................................... 13

*United States v. Gaubert*,
   499 U.S. 315 (1991).................................................................................................. 18, 19, 20

*United States v. Olson*,
   546 U.S. 43 (2005) ............................................................................................................... 14

*United States v. Varig Airlines*,
   467 U.S. 797 (1984).............................................................................................................. 19

*United States v. White Mountain Apache Tribe*,
   537 U.S. 465 (2003).............................................................................................................. 14

*Valdez v. United States*,
  56 F.3d 1177 (9th Cir. 1995) ................................................................. 20

*Wettstein v. United States*,
  No. 95-15156, 1995 WL 641353 (9th Cir. Oct. 31, 1995) ............................ 15

*Whisnant v. United States*,
  400 F.3d 1177 (9th Cir. 2005) ........................................................ 19, 20

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ........................................................ 13, 14

**State Cases**

*Bacon v. Southern Cal Edison Co.*,
  62 Cal. Rptr. 2d 16 (Cal. Ct. App. 1997) ................................................. 17

*Calvillo-Silva v. Home Grocery*,
  968 P.2d 65 (Cal. 1998) ................................................................ 16, 17

*Cope v. Davison*,
  180 P.2d 873 (Cal. 1947) ................................................................... 16

*Hubbard v. Brown*,
  50 Cal. 3d 189 (1990) ...................................................................... 14

*Manuel v. Pacific Gas & Elec. Co.*,
  93 Cal. Rptr. 3d 9 (Cal. Ct. App. 2009) .................................................. 17

*Ornelas v. Randolph*,
  847 P.2d 560 (Cal. 1993) ................................................................... 15

**Federal Statutes**

28 U.S.C. § 1346(b)(1) ................................................................. 3, 13, 14

28 U.S.C. § 2680 ............................................................................. 18

28 U.S.C. § 2680(a) .................................................................... 1, 3, 18

54 U.S.C. § 100101(a) ........................................................................ 5

**State Statutes**

Cal. Civ. Code § 8 ............................................................................ 1

Cal. Civ. Code § 846 ................................................................... 1, 2, 14

Cal. Civ. Code § 846(a) ..................................................................... 15

Cal. Civ. Code § 846(b) ..................................................................... 15

Cal. Civ. Code § 846(d) ..................................................................... 16

Cal. Civ. Code § 846(d)(1) .................................................................. 16

## Federal Rules

Fed. R. Civ. P. 12(b)(1)........................................................................................................... 13

Fed. R. Civ. P. 12(h)(3).......................................................................................................... 13

## Federal Regulations

36 C.F.R. § 2.15....................................................................................................................... 5

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 4, 2023, at 10 a.m., or as soon thereafter as this matter may be heard, in Courtroom 1 before the Honorable Ana de Alba, United States District Court Judge, via Zoom videoconference, the United States will bring a Motion to Dismiss for Lack of Subject Matter Jurisdiction.  The United States seeks to dismiss Plaintiff's wrongful death claim because this Court lacks jurisdiction.  First, the Court lacks jurisdiction because California's recreational immunity statute, Cal. Civ. Code § 846, would bar Plaintiff's claim against a private landowner.  That statute therefore bars a Federal Tort Claims Act (FTCA) claim against the United States.  Second, the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), retains federal sovereign immunity for discretionary executive-branch decisions that implicate policy considerations such as those Plaintiff challenges here.  Accordingly, sovereign immunity bars Plaintiff's claim under the discretionary function exception.  For these two independently adequate reasons, the Court lacks jurisdiction and Plaintiff's complaint must be dismissed.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction

On December 25, 2018, three days into the 2018-2019 lapse of federal appropriations (the federal shutdown), 32-year-old Joshua Conner died in Yosemite National Park.  Conner lost his footing while attempting to rescue his unleashed dog that had walked beyond the edge of a hiking trail. The trail was above the Silver Apron, a rock and water formation that connects to the Merced River below Yosemite Valley's Mist Trail.  Conner fell into the Merced River, struck his head on rocks[1], and was pulled from the water by other park visitors.  Yosemite emergency responders hiked to Conner's location to render aid.  Their resuscitation efforts ultimately failed.

Plaintiff Deborah Nickles sued the United States under the Federal Tort Claims Act (FTCA), alleging that the National Park Service (NPS) was negligent for failing to close Yosemite during the federal shutdown.  ECF 1 at ¶ 1.  That failure, Plaintiff alleges, allowed Conner access to the trail "without appropriate supervision, notice of safety rules nor access to emergency rescue services" and permitted him "to hike with dogs on a trail near dangerous waterfalls without any notice that dogs were prohibited on the trail and presented additional safety hazards."  ECF 1 at ¶ 49.

But dogs have long been prohibited on *all* of Yosemite's hiking trails because they present dangers to themselves, their owners, other visitors, and the park's wildlife and plant life.  On his hiking route, Conner passed four signs advising him that dogs are prohibited on the trail.  This information was also available on the park's web site under the "Plan Your Trip" tab and at various locations within the park.

Moreover, due to the federal shutdown that began three days before the incident, Conner entered the park to recreate (to go hiking) without fee and at his own risk.  By operation of California's Recreational Immunity Statute, Cal. Civ. Code § 846, the NPS did not owe Conner any duty to supervise him on Yosemite's trails, to prevent him from bringing dogs on Yosemite's trails, to warn Conner that his poor judgment in taking a dog off-leash in Yosemite was dangerous, or to rescue Conner after he fell while trying to rescue that off-leash dog.  Because the recreational immunity statute would shield a private

---

[1]   The Stanislaus County Coroner concluded that Conner died of craniocerebral injuries, but that cardiomyopathy was a contributing factor, noting that Conner "had been consuming amphetamine prior to death."  *See* Declaration of Theresa Austin ¶ 26.

landowner from Plaintiff's negligence claim, the Court lacks jurisdiction over Plaintiff's FTCA action against the United States.  28 U.S.C. § 1346(b)(1); *Brownback v. King*, 141 S. Ct. 740, 746 (2021) (a federal court has jurisdiction over an FTCA claim only if plaintiff plausibly alleges all six elements of the FTCA's sovereign-immunity waiver, including "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred") (quoting 28 U.S.C. § 1346(b)(1)).

The Court also lacks jurisdiction under the FTCA's discretionary function exception, 28 U.S.C. § 2680(a).  The NPS's determinations about allowing park access during the shutdown, keeping certain trails open, and placing warning signs within national parks are protected by the discretionary function exception.  And Plaintiff's contention that the entire national park system allowed people to enter parks during the federal shutdown without adopting a formal policy is wrong.  The NPS did indeed have a formal policy allowing parks to remain accessible.  That policy had been finalized just prior to the previous federal shutdown in January 2018.  It remained applicable in December 2018, when the 2018-2019 federal shutdown began.  And the decision in that policy to allow national park access during the federal shutdown arose from political leadership on a range of policy considerations.  As such, it is precisely the kind of executive-branch determination that the discretionary function exception protects from judicial review in an FTCA case.

## II.   Background

### A.   Yosemite National Park and the 2018/2019 Lapse of Federal Appropriations

#### 1.   Yosemite National Park

Yosemite National Park was first established as a preserve in 1864 by order of President Abraham Lincoln.[2]  In 1890, Congress made Yosemite America's third national park.  And in 1916, Congress transferred Yosemite's administration to the newly created National Park Service.[3]  Spanning over 750,000 acres, Yosemite is roughly the size of Rhode Island.  It features some of the most stunning and picturesque landscapes in all North America.[4]  Approximately 3.5 million people visit Yosemite annually,

---

[2]  Declaration of Teresa Austin at ¶ 4.

[3]  *Id*. at ¶ 4.

[4]  *Id*. at ¶ 5.

many traveling from distant parts of the world.[5]   Summer is the most popular season for Yosemite visitors. The park adds additional seasonal rangers and visitor-support staff during that season.[6]   In the winter months, NPS employs substantially fewer park staff.   The park also includes various lodges, campgrounds, food and beverage operations, expedition guides, and transportation services operated by third-party businesses under the park's concessions program.   Some of these businesses operate in the winter, but many do not.[7]

Yosemite law enforcement rangers manage safety and emergency response in the park.   Those rangers are divided over three districts in the park.[8]   The Yosemite Valley district is at the center of the park.   It includes some of the park's most popular hiking trails, including the trail on which Joshua Conner's December 25, 2018 incident occurred.[9]   The park's ranger staff is enhanced by seasonal employees in the summer months, but on a typical afternoon in December, the Valley District will have three to five rangers on-duty, including the supervisor.[10]   The ranger staff are responsible for law enforcement and emergency needs including search and rescue, and all of Yosemite's rangers are emergency medical technician (EMT) certified.[11]   During the months in which wildfire risk is amplified, Yosemite has helicopter operations available on an exclusive-use basis with an aviation contractor. During the months when the exclusive-use helicopter contract is in effect, the helicopters are available to assist in search and rescue services in the park.   The Yosemite exclusive-use helicopter arrangement is not in effect in December, and was not in effect in December 2018, regardless of the federal shutdown.[12]

Yosemite features 750 miles of trails that facilitate visitor experience of the park's dramatic elevations, waterfalls and geologic features, and ecology.[13]   Visitor conduct on Yosemite's trails is subject

---

[5] *Id*. at ¶ 5.

[6] *Id*. at ¶ 6.

[7] *Id*. at ¶ 6

[8] *Id*. at ¶ 7.

[9] *Id*. at ¶ 7.

[10] *Id*. at ¶ 8.

[11] *Id*. at ¶ 9.

[12] *Id*. at ¶ 10.

[13] *Id*. at ¶ 11.

to the provisions of Title 36, Chapter 1 of the Code of Federal Regulations, as supplemented by the Yosemite Superintendent's Compendium.[14]  Enforcement of these rules falls to the park's law enforcement rangers.  The park also employs interpretive rangers who serve a visitor-relations function. They may help guide visitors to be compliant with the regulations and park rules.  But these staff are predominantly seasonal, summer employees and do not patrol trails in the winter months.  Given the 750 miles of park trails, park staff interaction with visitors on trails is uncommon—particularly in the winter when seasonal staff are not on duty.  Rangers are not posted at trailheads to supervise hikers or ensure that they are adhering to the park's posted rules and safety advisories.[15]

In accordance with 36 C.F.R. § 2.15 and the Yosemite Superintendent's Compendium, pet dogs are prohibited on all trails at Yosemite—there are no "dog-friendly" hiking trails in the park.  This is because dogs, even if on a leash, pose a safety to risk to their owners, other visitors, and the park's wildlife and plant life.  Along with the posted and publicly available compendium, the park's prohibition of pets on trails is (and was in December 2018) posted on Yosemite's web site, posted at the entrance gates, and posted in numerous trail locations including at trailheads and on the park's various trail distance signs.[16] Having a pet dog on a trail at Yosemite is subject to federal criminal penalty under 36 C.F.R. § 2.15.

2.      **NPS Policy Regarding Safety in National Parks**

Created in 1916 by the NPS Organic Act, the NPS is charged by Congress to "conserve the scenery, natural and historic objects, and wild life" under its care to provide for their enjoyment and to leave them "unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a).  NPS's mission requires a balance between conservation and enjoyment.  To carry out that mission, NPS uses a three-tiered policy structure led by the NPS Management Policies.  Those policies expressly recognize that national parks contain hazards, and that safety is a responsibility shared by the NPS and park visitors.  *See* Austin Decl. at ¶ 15 (citing NPS Management Policies § 8.2.5.1 ("Park visitors must assume a substantial degree of

---

[14]  *Id*. at ¶ 11.

[15]  *Id*. at ¶ 12.

[16]  The park's webpage features a conspicuous "Plan Your Visit" tab with a section on pets that notifies visitors that pets are not allowed on any trails in Yosemite. https://www.nps.gov/yose/planyourvisit/pets.htm .  The park's pet advisory was the same on December 25, 2018 as it is today.  Austin Decl. at ¶ 13.

risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments")).  The Management Policies further recognize that managing safety within national parks requires discretion at the park level to meet the individual challenges that each park may provide:[17]

> These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs or artificial lighting, distribute weather warnings or advisories, initiate search-and-rescue operations or render emergency aid, eliminate potentially dangerous animals, close roads and trails or install guardrails and fences, and grant or deny backcountry or climbing permits.

The NPS Director's Orders again underscore individual park discretion to manage public safety. NPS Director's Order #50C provides that "the means by which public safety concerns are to be addressed in each park falls under the discretion of the park's superintendent" who "must make discretionary decisions that balance public recreation and safety with preservation of the protected natural, historic, or cultural setting.  While the NPS will strive to minimize the frequency and severity of visitor mishaps along with the associated pain, suffering, and financial expense, ultimately, visitors are responsible for their own safety."[18]

Because of these policies, determinations about when and where to post warnings on Yosemite trails, when specific trails are open to the public, and how to conduct park search and rescue operations are discretionary.  Such determinations require weighing visitor safety and impact on the park's natural, historic, and cultural resources as well as limitations on park staff and financial resources.

### 3.   NPS Contingency Plan for Lapse of Federal Appropriations 2018

Like most federal agencies, the NPS's operating budget is appropriated annually through appropriations bills passed by Congress and signed into law by the president.[19]  When Congress fails to

---

[17]  Austin Decl. at ¶ 15.

[18]  *Id.* at ¶ 16; NPS Director's Order #50C, Public Risk Management Program at § 1.1, p. 2, https://www.nps.gov/subjects/policy/upload/DO_50C_5-7-2010.pdf .

[19]  *See* Declaration of Jessica Bowron at ¶ 4.

pass new appropriations or otherwise extend existing funding levels through a continuing resolution, an appropriations lapse occurs. When that happens, the NPS generally cannot incur new obligations. It must furlough most of its staff but for certain "excepted" staff authorized to remain on duty to meet essential needs.[20] A budget dispute led to a 17-day shutdown in October 2013. Based on contingency plans in place at the time, the NPS closed national parks by closing physical gates, posting notice that entry is prohibited, and ordering concessions and other third-party operators in the national park system to cease operations. That decision drew partisan criticism.[21]

Four years later, under a new administration, Congressional budget disputes again raised the possibility of federal shutdown in fiscal year 2018. Federal agencies updated their contingency planning. The new administration determined that NPS's contingency plan would change. The new plan would allow many parks (including Yosemite) to remain accessible to the public and allow concessioners and other third-party operators within those parks to continue operating.[22] This meant Yosemite would remain "open" in the sense that its gates were not closed, and some concessions continued in the park. But most NPS employees would be furloughed, including visitor-relations, fee collection, and maintenance staff. So, Yosemite would be unable to collect fees or provide customary park services, and visitors would enter the park at their own risk.[23]

On January 19, 2018, as the January 2018 shutdown loomed, the NPS finalized the National Park Service Contingency Plan, 2018.[24] That same day, the Department of the Interior submitted the plan to the Office of Management and Budget and posted the plan the Department's shutdown guidance page. As signals from Congress continued to confirm that a shutdown would commence at midnight that night, the NPS Director's Washington Support Office (WASO) issued service-wide guidance to parks to post this standard signage at their entrance and access points:[25]

---

[20] *Id*. at ¶ 5.

[21] *Id*. at ¶ 6; *See, e.g.* Stephanie Condon, *National Parks Caught in Partisan Government Shutdown Blame Game*, CBS NEWS, October 16, 2013; https://www.cbsnews.com/news/national-parks-caught-in-partisan-government-shutdown-blame-game/

[22] Bowron Decl. at ¶ 7.

[23] *Id*. at ¶ 8.

[24] *Id*. at ¶ 9.

[25] *Id*. at ¶ 10, Exh. 2-B; *see also* Austin Decl. at ¶ 19.



National Park Service
U.S. Department of the Interior

# Important Notice to Park Visitors

Due to the lapse in federal appropriations, the National Park Service (NPS) is unable to fully staff the properties under its management. It is not feasible to close or otherwise prohibit all access to NPS properties. Park visitors are advised to use extreme caution if choosing to enter NPS property, as NPS personnel will not be available to provide guidance, assistance, maintenance, or emergency response. Any entry onto NPS property during this period of federal government shutdown is at the visitor's sole risk.

The NPS will not operate parks during the shutdown period, and no visitor services will be provided. The NPS will not issue permits, conduct educational programs, collect trash, operate or provide restrooms, maintain roads or walkways (including plowing and ice melting), or provide visitor information.

The NPS will cease providing services for NPS-operated campgrounds, including maintenance, janitorial, bathrooms, showers, check-in/check-out, and reservations. **Visitors in campgrounds will not be asked to leave, but no services will be available, including check-in/check-out services. Visitors holding campground reservations should be aware that there is no guarantee their reserved campsite will be ready and available should they arrive during a government shutdown.**

The NPS's policy shift regarding park access during federal shutdown, and the fact that visitors could visit national parks without fee, albeit at their own risk, was well-covered by the news media—including in California with news about Yosemite and other parks in the state.[26]

Less than a year later in December 2018, a new budget impasse signaled another impending federal shutdown. The events leading to the shutdown were widely covered national news. At Yosemite, the park's shutdown team prepared to execute the NPS contingency plan, which was unchanged from

---

[26] *See, e.g.* Matthias Gafni and Emily DeRuy, *Many National Parks Remain Open During Government Shutdown, Some Are FREE*, EAST BAY TIMES, Jan. 20, 2018, ("park visitors would enter at their own risk and emergency response would be delayed with limited staffing"), https://www.eastbaytimes.com/2018/01/20/heres-what-parks-services-are-open-closed-during-government-shutdown/.

January.[27]  Within hours of the official federal appropriations lapse at midnight on December 22, 2018, the main NPS website and Yosemite's website featured a banner.  That banner advised the public of the federal shutdown.  It stated that, while some parks would remain accessible, NPS services would not be provided.  Yosemite contingency operations placed park staff on furlough and posted notice of the park's shutdown posture, including on its website and social media.[28]  The sign notifying visitors that park entry was at their own risk was posted on entry gates. [29]  The park's law enforcement ranger and rescue staff remained on-duty as safety personnel excepted from the furlough.[30]

### B.    Joshua Conner's December 25, 2018 Incident

According to the complaint, Conner and his girlfriend parked their vehicle at the Happy Isle Trailhead in Yosemite on Wednesday, December 25, 2018—three days into the federal shutdown.[31]  Despite the park's posting of signs, website, and social media information, and widespread media coverage, Plaintiff alleges that upon Conner's arrival to Yosemite, "there were no signs advising them that there were no visitor's services available, nor that emergency and rescue services would be limited due to the government shut-down."  *Id.* at ¶ 30.  Entering the park, however, Conner would have driven through an open arm-gate with an unoccupied fee-collection booth, paying no fee to enter the park and at his own risk—as explained by the WASO federal shutdown warning sign posted on the booth.[32]

After Conner parked near the Happy Isles trailhead "to go hiking" with his girlfriend and two dogs, the group set off on the John Muir trail.[33]  Plaintiff alleges that Conner "saw no signs nor received any instruction that dogs were not permitted on the trail."[34]  If Conner did not see the signs that dogs are not permitted on trails in Yosemite, it was because he was not looking.  Between where Conner parked and

---

[27]  Austin Decl. at ¶ 17; Bowron Decl. at ¶ 11.

[28]  *See, e.g.* https://twitter.com/yosemitenps/status/1076525438296420352?s=46&t=ktjbeOBO07SGi-P2GGm9Ig, December 22, 2018, 12:10 p.m.

[29]  Austin Decl. at ¶ 19; Bowron Decl. at ¶ 11.

[30]  *Id.* at ¶ 20.

[31]  ECF 1 at ¶ 29; According to Plaintiff's administrative claim, Conner arrived at the park the day before, December 24, 2018, and stayed in overnight lodging.  Austin Decl. at ¶ 21.

[32]  Austin Decl. at ¶¶ 18, 19, 21.

[33]  ECF 1 at ¶ 31.

[34]  *Id.* at ¶ 31

where he began hiking down the John Muir Trail, Conner passed four signs indicating that dogs are prohibited on the trails.[35]  Immediately adjacent to the road that separates that parking lot and the trailhead, Conner passed this sign with a "no-dogs" graphic[36]:



/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[35]  Austin Decl. at ¶ 23.

[36]  *Id.*, Exh. 1-B.

Then, as Conner made his way past the trailhead and down the trail, he passed trail information signs with notice of the park's prohibition of pets on trails, and the (right) graphic sign indicating that dogs are prohibited:[37]

 

Finally, as Conner proceeded further down the trail, he encountered a fourth sign indicating that pets are prohibited on Yosemite's trails:



Notwithstanding the clear signage and web-site information prohibiting pet dogs on any trails in

---

[37] *Id.*, Exh. 1-C, 1-D

Yosemite, Conner and his girlfriend began their hike with two dogs, off-leash.  According to the Complaint and park incident-report documents, around 2:30 p.m. the couple and their two dogs were above the Silver Apron (an area of swift-moving water through a large rock formation).  One of the couple's dogs "had gone off the trail."  ECF 1 at ¶ 34.  When Conner left the trail to retrieve the dog, both fell into the moving water.  Conner struck his head on the rocks as he fell into the Merced River below.

As Conner's girlfriend yelled for him, other hikers below the Silver Apron heard the commotion and called 9-1-1.  At 2:42 p.m., the Yosemite emergency incident commander center received report of the call.[38]  The command center dispatched a team of emergency responders on foot, the first of which arrived on the scene at 3:22 p.m.[39]  After additional responders arrived, they attempted to secure a helicopter medical evacuation through the California Highway Patrol in Paso Robles, but impending darkness made the rescue flight unavailable.  ECF 1 at ¶ 38.[40]  Contrary to Plaintiff's "information or belief" allegations (ECF 1 at ¶ 36), the Yosemite exclusive-use helicopter does not operate in winter with or without a federal shutdown.[41]  At approximately 5:50 p.m., rescuers ceased resuscitation and Conner was pronounced dead.

In attending to Conner, NPS rangers found a small case attached to Conner's wrist that contained powder and capsules that appeared to be illicit drugs.  Thereafter, the Stanislaus County Coroner performed an autopsy that concluded Conner died of "craniocerebral injuries sustained in a fall."  The autopsy further opined that "the contributory factor of death was cardiomyopathy.  He had been consuming amphetamine prior to death."  The coroner's toxicology screen came back positive for amphetamine and benzodiazepine.

On December 21, 2020, Plaintiff timely submitted an FTCA administrative tort claim to the Yosemite superintendent's office, seeking $7.5 million for the wrongful death of Joshua Conner.  On September 8, 2022, the Department of the Interior denied the claim.  Plaintiff timely filed the instant lawsuit on March 3, 2023.

---

[38]  Austin Decl. at ¶ 24.

[39]  Austin Decl. at ¶ 25.

[40]  *Id.* at ¶ 25; ECF 1 at ¶ 38.

[41]  Austin Decl. at ¶ 10.

### III.    Legal Standard – Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

A federal court's "power to adjudicate claims is limited to that granted by Congress, and such grants are not to be lightly inferred." *Al Nieto v. Ecker*, 845 F.2d 868, 871 (9th Cir. 1988). A motion to dismiss under Rule 12(b)(1) tests the subject-matter jurisdiction of the court. *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039-40 (9th Cir. 2003); *Doe v. Hagee*, 473 F. Supp. 2d 989, 994 (N.D. Cal. 2007). "When subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Tosco Corp. v. Communities for Better Environment*, 236 F.3d 495, 499 (9th Cir. 2001). A court may exercise jurisdiction only when specifically authorized to do so, and it must dismiss an action when it becomes apparent that jurisdiction is lacking. Fed. R. Civ. P. 12(h)(3).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* A factual challenge, on the other hand, allows the court to look beyond the complaint without "presum[ing] the truthfulness of the plaintiff's allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). On a Rule 12(b)(1) motion, the Court can hear evidence outside the pleadings and resolve factual disputes, if necessary, without treating the motion as one for summary judgment. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1997).

A district court cannot hear a suit against the United States unless the government has waived sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (noting the elements of an FTCA claim are jurisdictional). "Sovereign immunity is jurisdictional in nature," meaning that the presence or lack of a sovereign-immunity waiver is properly resolved on a motion to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Robinson*, 586 F.3d at 685; *Sierra Club v. Whitman*, 268 F.3d 898, 905-906 (9th Cir. 2001). The Supreme Court recently emphasized that a plaintiff "must plausibly allege all six FTCA elements", including that "'the United States, if a private person, would be liable to the claimant' under state law" to establish subject-matter jurisdiction. *Brownback v. King*, 141 S. Ct. 740, 749 (2021) (quoting 28 U.S.C. § 1346(b)(1)).

IV.   **Argument**

A.   **The FTCA's Private-Person Liability Standard Divests the Court of Jurisdiction**

    1.   **The FTCA's Private-Person Liability Standard**

The FTCA is "a limited waiver of sovereign immunity." *Gonzalez v. United States*, 814 F.3d 1022, 1026 (9th Cir. 2016).   Before a district court may exercise jurisdiction over any suit against the government, it must have "a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver." *Jachetta v. United States*, 653 F.3d 898, 904 (9th Cir. 2011) (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003)).

District courts have exclusive jurisdiction over FTCA actions claiming money damages for personal injury "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."   28 U.S.C. §§ 1346(b)(1), 2672, 2675; *see also United States v. Olson*, 546 U.S. 43, 44-47 (2005).   Thus, the United States has waived immunity only to the extent that a private person would be liable under like circumstances.   *Id*.; *see also Brownback*, 141 S. Ct. at 741; *Jachetta*, 653 F.3d at 904.   In other words, a plaintiff must plausibly allege that the federal government's actions, if committed by a private party, would constitute a tort in the state where the incident occurred.   *Brownback*, 141 S. Ct. at 749.   *Jachetta*, 653 F.3d at 904 (citing *Bolt v. United States*, 509 F.3d 1028, 1031 (9th Cir. 2007).

    2.   **California's Recreational Immunity Statute Bars Plaintiff's Claim**

California's recreational immunity statute, Cal. Civ. Code § 846, would prevent Plaintiff from suing a private landowner for wrongful death under these circumstances.   The FTCA's private-person liability standard therefore prevents her from suing the United States for such a claim.

California's recreational immunity statute aims to encourage landowners to permit the public to recreate on their land free of charge without fear of liability.   *See Hubbard v. Brown*, 50 Cal. 3d 189, 193 (1990).   The statute provides in relevant part:

> (a) An owner of any estate or any other interest in real property, whether possessory or nonpossessory, *owes no duty of care to keep the premises safe* for entry or use by others for any recreational purpose *or to give any warning* of hazardous conditions, uses of, structures, or activities on those premises to persons entering for a recreational purpose, except as provided

in this section.

Cal. Civ. Code § 846(a) (emphasis added).

By its plain language, California's recreational immunity statute absolves landowners of *any* duty of care, including the duty to warn, provided that the terms for the statute's application are met.  Cal. Civ. Code §§ 846(a),(e).  In other words, when a person chooses to enter land in California for recreation without paying a fee, that person waives the right to sue the landowner for negligence.  *Ornelas v. Randolph*, 847 P.2d 560, 567 (Cal. 1993).

It is well settled that California's recreational immunity statute applies to the United States as a defendant in FTCA cases.  *See Ravell v. United States*, 22 F.3d 960, 961-62 (9th Cir. 1994); *Mattice v. U.S. Dept. of Interior*, 969 F.2d 818 (9th Cir. 1992); *Mace v. United States*, No. 15-cv-04060-LB, 2015 WL 8770677, at *3-4 (N.D. Cal. Dec. 15, 2015).  And courts regularly apply the recreational immunity statute to bar claims based on incidents in national parks when no entry fee was paid.  *See, e.g, Mattice*, 969 F.2d at 818 (Redwood National Park); *Spires v. United States*, 805 F.2d 832, 834 (9th Cir. 1986) (Golden Gate National Recreation Area);  *Wettstein v. United States*, No. 95-15156, 1995 WL 641353, at *1 (9th Cir. Oct. 31, 1995) (same).

### a.   **Conner's Hiking in Yosemite Was a Recreational Activity**

There can be no doubt that Conner was engaged in a "recreational purpose" when he fell after leaving the hiking trail in Yosemite while attempting to retrieve his unleashed dog.  *See* ECF 1 at ¶ 30 ("Conner and his girlfriend along with their two dogs parked at Happy Isles Trailhead in Yosemite National Park to go hiking.")  The recreational immunity statute defines "recreational purpose" broadly to include sightseeing, nature contacting, and hiking.  Cal. Civ. Code § 846(b).

### b.   **No Exception to the Recreational Immunity Statute Applies**

California's recreational immunity statute provides three exceptions to landowner immunity from negligence lawsuits:

> (1) Willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity;
> (2) Injury suffered in any case where permission to enter for the above purpose was granted for a consideration other than the consideration, if any, paid to said landowner by the state, or where consideration has been received from others for the same purpose;

(3) Any persons who are expressly invited rather than merely permitted to come upon the premises by the landowner.

Cal. Civ. Code § 846(d).

Plaintiff does not plead—nor could she plausibly allege—that any of the three exceptions to California's recreational immunity statute applies. First, Conner paid no fee to enter Yosemite, as the federal shutdown resulted in the furlough of most park staff including fee collection staff. No fees were collected from visitors during the shutdown beginning December 22, 2018. *See* Austin Decl. at ¶¶ 19-21.

Second, Conner was not expressly invited by the United States to go hiking in Yosemite. *See Ravell*, 22 F.3d at 963, (observing that "express invitation" for purposes of California's recreational immunity statute is limited to "those persons who were personally selected by the landowner").

Finally, Plaintiff does not and could not plausibly allege that the United States "willful[ly] or malicious[ly]" failed "to guard or warn against a dangerous condition." Cal. Civ. Code § 846(d)(1). In California, the standard for willfulness or maliciousness is "very high." *Armstrong v. United States*, No. C 07-3793 SBA, 2008 WL 5047680, at *5 (N.D. Cal. Nov. 24, 2008). "Willful misconduct," the Ninth Circuit observed in *Spires*, "is any intentional act of an unreasonable character undertaken in disregard of a known risk or a risk so obvious that the actor must be taken to have been aware of it, and so great as to make the resulting harm highly probable." 805 F.2d at 834 (quoting *Rost v. United States*, 803 F.2d 448, 450-52 (9th Cir. 1986)). The California Supreme Court stated that:

> Unlike negligence, which implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, willful misconduct is not marked by a mere absence of care. Rather, it 'involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences.'

*Calvillo-Silva v. Home Grocery*, 968 P.2d 65, 76 (Cal. 1998) (quoting *Cope v. Davison*, 180 P.2d 873, 878 (Cal. 1947)), overruled on other grounds in *Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 853, n.19 (2001).

Willful or malicious conduct is not presumed, and the plaintiff must prove all three essential elements: "(1) actual or constructive knowledge of the peril to be apprehended; (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) conscious failure

to act to avoid the peril." *Id.* at 76-77; *see also Spires*, 805 F.2d at 834 (listing the same three elements and reversing district court where findings of fact failed to support conclusion that the United States had actual or constructive knowledge).

Here, Conner ignored at least four signs warning him that pets were prohibited on Yosemite's trails. In California, posting a warning rebuts the allegation that a landowner's conduct was willful or malicious. *See Mattice*, 969 F.2d at 823; *Manuel v. Pacific Gas & Elec. Co.*, 93 Cal. Rptr. 3d 9, 24 (Cal. Ct. App. 2009); *Bacon v. Southern Cal Edison Co.*, 62 Cal. Rptr. 2d 16, 19 (Cal. Ct. App. 1997) (warning sign "sufficient to show absence of willful or malicious conduct because [defendant] attempted to prevent the harm anticipated"). And the NPS responded quickly and appropriately to Conner's emergency, sending medically trained law enforcement rangers to help him. The first responder team dispatched within minutes of receiving the 9-1-1 call. *See* Austin Decl. at ¶¶ 20, 24, 25 (ranger and rescue staff were not furloughed). Those rangers hiked to Connor's location to render aid, working to resuscitate him. Plaintiff alleges that Conner was deprived of the opportunity to be evacuated by the NPS "exclusive use helicopter," but that service does not operate in December, regardless of whether a federal shutdown occurs. *Id.* at ¶ 10.

Finally, the NPS's determination to leave the park gates open to allow access likewise could not support a finding of willful or malicious conduct undertaken with the intent to harm or "positive, active, and absolute disregard" of the likelihood harm would result. *Calvillo-Silva*, 968 P.2d at 76. The NPS kept all ranger and rescue staff on-duty as excepted personnel. And it posted entrance-booth warning signs advising extreme caution. Those signs explained that no NPS services would be provided and that entering the park during the shutdown "is at the visitor's sole risk." Bowron Decl. Exh. 2-B. And notably, apart from entering the park without fee and not having access to services such as the visitor's center, Conner's activities were otherwise unaffected by the federal shutdown. Yosemite's ranger staff are not posted at trailheads to supervise hiker conduct. There are no "dog-friendly" trails in Yosemite to which he otherwise would have been directed. To the contrary, hikers' conduct on the trail is regulated by signage that Conner ignored. And the NPS medical-response resources were no different on that winter day than they would have been had the federal shutdown not occurred. Austin Dec. at ¶¶ 9, 10, 25.

Because Conner did not pay a fee to hike on Yosemite's trails, the NPS did not owe Conner any

duty to ensure his safety, supervise his conduct, or warn him of the dangers of hiking with dogs off-leash through Yosemite's majestic, yet perilous terrain.  Plaintiff has not and cannot plausibly allege a claim that could subject a private landowner to liability under California law.  California law immunizes private landowners from liability under facts like these.  As a result, this Court lacks jurisdiction over Plaintiff's FTCA claim against the United States.

### B.       The FTCA's Discretionary Function Exception Divests the Court of Jurisdiction

The FTCA's limited waiver of sovereign immunity is subject to several exceptions. *See* 28 U.S.C. § 2680. When an exception applies, the United States retains sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed.  *See Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000).  In addition to lacking jurisdiction because of California's recreational immunity statute, this Court also lacks jurisdiction by operation of the FTCA's discretionary function exception ("DFE"). *See* 28 U.S.C. § 2680(a).

In passing the FTCA, Congress made sure that the United States did *not* waive its sovereign immunity for tort claims resulting from actions that invoke "a discretionary function or duty … whether or not the discretion involved be abused." *Id*.  The DFE "is an important exception to the FTCA," the Ninth Circuit recently reiterated, "[t]he government does not waive immunity for tort claims if the alleged tortfeasor was performing a discretionary function or duty when he or she injured the plaintiff.  This is true even if the employee abused that discretion." *Lam v. United States*, 979 F.3d 665, 672 (9th Cir. 2020) (citing 28 U.S.C. § 2680(a)); *see also United States v. Gaubert*, 499 U.S. 315, 325 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  The DFE "marks the boundary between Congress' willingness to impose tort liability on the United States and its desire to protect" certain decision-making from "judicial second-guessing." *Berkovitz*, 486 U.S. at 536-37; *Chadd v. United States*, 794 F.3d 1104, 1108 (9th Cir. 2015).

The Supreme Court prescribed a two-part test to determine if the DFE applies.  *Gaubert*, 499 U.S. at 322-23.  Courts must first ask whether the challenged conduct "'involve[s] an element of judgment or choice,'" as determined by the "'nature of the conduct, rather than the status of the actor.'" *Chadd*, 794 F.3d at 1109 (quoting *Gaubert*, 499 U.S. at 322 and *United States v. Varig Airlines*, 467 U.S. 797, 813

(1984)); *see also Morales v. United States*, 895 F.3d 708, 716 (9th Cir. 2018).  Where a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow, the "'employee has no rightful option but to adhere to the directive" and the discretionary function exception does not apply.  *Chadd*, 794 F.3d at 1109 (quoting *Terbush v. United States*, 516 F.3d 1125, 1130 (9th Cir. 2008)).  Conversely, where no federal statute, regulation or policy prescribes a specific course of action, the challenged conduct involves an element of judgment.  *See Berkovitz*, 486 U.S. at 536.  Further, where the policies that inform the conduct at issue allow the exercise of discretion, the agency's acts or failures to act are presumed to be discretionary.  *Lam*, 979 F.3d at 674.  Finally, it is important to consider applicable policies and authorities in context to determine if they are discretionary— "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Id*. at 677.

If the conduct involves exercising discretion, courts must next determine whether "the judgment of the government employee [is] 'of the kind that the discretionary function exception was designed to shield.'" *Teplin v.United States*, No.17-cv-02445-HSG, 2018 WL 1471907, at *4 (N.D. Cal. March 26, 2018) (quoting *Gaubert*, 499 U.S. at 322-23).  The DFE is designed to "'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy' through a tort action," therefore courts construe it as "protect[ing] only governmental actions and decisions based on considerations of public policy." *Id*.; *see also Varig Airlines*, 467 U.S. 797, 814 (1984).  The focus of this inquiry is therefore "whether the 'nature of the actions taken,' pursuant to an exercise of discretion, 'are susceptible to policy analysis.'" *Teplin*, 2018 WL 1471907, at *4 (quoting *Gaubert*, 499 U.S. at 325); *see also Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) (the discretion must be "susceptible to social, economic, or political policy analysis"); *Nurse*, 226 F.3d at 1001 (explaining that the decision "'need not *actually* be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis.'") (quoting *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998)).  Where the relevant policies provide for discretion, it must be presumed that the government's actions are grounded in policy when exercising that discretion.  *Lam*, 979 F.3d at 681 (citing *Gaubert*, 499 U.S. at 324; *Chadd*, 794 F.3d at 1104).

If both prongs of the *Gaubert/Berkowtiz* test are met, the DFE applies.  The United States retains

its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed. *See Nurse*, 226 F.3d at 1000. This is true even where the government may have been negligent in the performance of such discretionary acts, as "[n]egligence is irrelevant to the discretionary function inquiry." *Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991); *see also Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989); *Whisnant*, 400 F.3d at 1185.

1. **DFE Applies to NPS Decisions About Whether to Close the Park During Federal Shutdown**

Plaintiff alleges that the NPS should not have allowed visitors into Yosemite during the federal shutdown and that it failed to warn Conner or otherwise "supervise" him by intervening when he elected to take dogs off-leash on Yosemite's hiking trails (conduct that is prohibited and illegal). But NPS decisions in these areas are left to the discretion of the managers at Yosemite. *See* NPS Management Policies (2006) at § 8.1.2.5; NPS Director's Order 50C. And the Ninth Circuit has held that the DFE applies to them.

The Ninth Circuit has repeatedly recognized that NPS decisions about whether to close trails and/or to post warning signs are covered by DFE because they require significant discretion and judgment. Such decisions require NPS to balance competing policy considerations of maximizing access to and preserving natural resources with the need to minimize potential safety hazards. In deciding to keep certain trails open, "[p]ark rangers used their discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety. This decision was precisely the kind the discretionary function exception was intended to immunize from suit." *Childers v. United States*, 40 F.3d 973, 976 (9th Cir. 1994); *see also Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (DFE covered NPS decisions about trail design, trail maintenance, and whether, when, and how to warn visitors about potential hazards); *Terbush*, 516 F.3d at 1139 ("[T]he NPS's decision to close Glacier Point and the extent to which it later chose to warn about rockfalls at Glacier Point were discretionary judgments"). This reasoning applies equally to NPS decisions about whether to bar all access to the park during federal shutdown.

**V.   Conclusion**

For the foregoing reasons, the Court should dismiss Plaintiff's complaint for lack of jurisdiction.

1

2

3

Dated:  August 18, 2023                              PHILLIP A. TALBERT
4                                                    United States Attorney

5
                                              By:   /s/ VICTORIA L. BOESCH
6                                                   VICTORIA L. BOESCH
                                                    Assistant United States Attorney
7                                                   Attorney for United States

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28