1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH NICKLES, | Case No. 1:23-cv-00328-ADA-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND AND WITH PREJUDICE |
| v. | |
| UNITED STATES OF AMERICA, | (ECF Nos. 13, 14, 15, 16) |
| Defendant. | **OBJECTIONS DUE IN 14 DAYS** |

## I.

## INTRODUCTION

Currently before the Court is Defendant United States of America's motion to dismiss this action brought pursuant to Federal Rule of Civil Procedure 12(b)(1).  (ECF No. 13.)  On September 12, 2023, Plaintiff filed a notice of non-opposition to the motion to dismiss.  (ECF No. 16.)  For the reasons explained below, the Court recommends Defendant's unopposed motion to dismiss be granted, the complaint be dismissed without leave to amend, and this action be dismissed with prejudice.

## II.

## BACKGROUND

### A.      The Operative Complaint

Plaintiff Deborah Nickles brings this action individually and as administrator of the estate

1   of Joshua Conner.  (Compl., ECF No. 1.)  Plaintiff brings a claim for negligence and wrongful

2   death under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.  Plaintiff

3   claims this Court has jurisdiction under the FTCA pursuant to 28 U.S.C. § 1346 and 28 U.S.C. §

4   1331.  (Compl. ¶ 8.)

5           The complaint alleges Defendant is liable for the wrongful death of Joshua Conner

6   ("Conner" or the "Decedent") that occurred on Christmas Day, December 25, 2018.  Plaintiff

7   claims Defendant violated its contingency plan's edicts and negligently failed to close Yosemite

8   National Park ("Yosemite") during a governmental shutdown during which neither appropriate

9   supervision nor emergency rescue services were provided to protect the health and safety of the

10  public.  (Compl. ¶ 1.)  Plaintiff alleges that in the months preceding Conner's death, the National

11  Park Service ("NPS") acted through various agents and/or employees, whose negligent acts or

12  omissions occurred within the course and scope of their employment or agency for purposes of

13  the FTCA.  (Compl. ¶ 6.)

14          Plaintiff alleges that to the extent the draft fiscal year 2018 and 2019 NPS contingency

15  plans were not properly submitted to the Office of Management and Budget ("OMB") before the

16  December 22, 2018, governmental shutdown, NPS and Yosemite were required to close the

17  parks pursuant to the 2014 fiscal year contingency plan.  Plaintiff alleges that under the terms of

18  the 2014 fiscal year contingency plan, when NPS and Yosemite were forced to shutdown due to

19  a lapse in appropriations on December 21, 2018, Defendant, through NPS and Yosemite

20  officials, was required to close access to park roads and trails including Happy Isle Trailhead,

21  and post signs indicating the park was closed.  (Compl. ¶ 23.)

22          Plaintiff alleges that pursuant to 2006 NPS management policies, irrespective of a

23  governmental shutdown, NPS and Yosemite agents were required to consider visitor safety and

24  provide emergency medical services within the confines of certain policies.  (Compl. ¶ 25.)

25          Plaintiff alleges that when appropriations lapsed on December 21, 2018, for the NPS,

26  Defendant by and through its NPS and Yosemite agents failed to comply with the mandatory

27  duties described above, acted unreasonably and was otherwise negligent in permitting visitor

28  access to Yosemite's trails including The John Muir Trail near Happy Isle Trailhead without

1    appropriate visitor services, notice of closure and limited services, notice and enforcement of

2    park rules (including prohibition of dogs on the trail), and other services required to minimize

3    safety hazards and the risk of serious injury or death.  (Compl. ¶ 27.)

4           Turning to the events relating to the death underlying the complaint, Plaintiff alleges that

5    on December 25, 2018, Conner and his girlfriend along with their two dogs parked at Happy Ilse

6    Trailhead in Yosemite National Park to go hiking.  (Compl. ¶ 29.)  Plaintiff alleges that upon

7    arrival to Yosemite and the trailhead, there were no signs advising the couple that there were no

8    visitor services available, nor that emergency and rescue services would be limited due to the

9    governmental shut-down.  (Compl. ¶ 30.)  As Conner and his girlfriend hiked along the John

10   Muir Trail with their two dogs, they saw no signs nor received any instructions that dogs were

11   not permitted on the trail, and to the contrary, they saw multiple hikers who were also

12   accompanied by dogs.  (Compl. ¶ 31.)  Upon information and belief, Plaintiff claims that had the

13   park been staffed, Conner and his girlfriend would have been refused further access to the trail

14   with their dogs; would have been re-directed to dog-friendly trails, and would have been fully

15   instructed on the Park's dog restrictions.  (Compl. ¶ 32.)  Plaintiff contends that at all times

16   relevant, Conner and his girlfriend were lawfully permitted to be on the premises.  (Compl. ¶ 33.)

17          At approximately 2:30 p.m., while on the Silver Apron in between Nevada Falls and

18   Vernal Falls, Conner attempted to retrieve one of their dogs that had gone off the trail, and he

19   and the dog slipped on icy conditions into the Merced River.  (Compl. ¶ 34.)  Although 911 and

20   National Park Services Search and Rescue Service were immediately notified, Search and

21   Rescue Service did not arrive on-foot to aid Joshua Conner until almost an hour later at 3:25 p.m.

22   (Compl. ¶ 35.)  Plaintiff alleges upon information and belief, that Yosemite's Exclusive Use

23   Helicopter Operation was non-operational due to the shutdown.  (Compl. ¶ 36.)  Plaintiff claims

24   that instead of having access to the Exclusive Use Helicopter Operation for emergency medical

25   assistance and evacuation, first responders were forced to request assistance from Paso Robles, a

26   city located over 240 miles from Yosemite Park.  At 3:45 p.m., a helicopter out of Paso Robles

27   was denied flight due to "pumpkin time" (limited daylight).  (Compl. ¶¶ 37-38.)  Plaintiff notes

28   that on December 25, 2018, the sunset in Yosemite was at approximately 4:45 p.m.  (Compl. ¶

1   39.)

2       Plaintiff alleges upon information and belief, that had Yosemite's Exclusive Use

3   Helicopter Operation been operational at the time, the rescue team would have been able to

4   evacuate him from the mountain and deliver him to a Trauma Level 1 Center where life-saving

5   treatment could have been provided exponentially increasing his chances of survival.  (Compl. ¶

6   40.)  At approximately 5:50 p.m., Joshua Conner was pronounced dead while Yosemite's rescue

7   team was still attempting to warm him on the mountainside but unable to provide Level 1

8   Trauma Care required.  (Compl. ¶ 41.)

9       Plaintiff notes that on January 3, 2019, former NPS Director, Jonathan Jarvis, published

10  an editorial opinion stating that keeping the park facilities open without staff violates NPS's

11  founding charter to keep the parks "unimpaired for the enjoyment of future generations" citing

12  to, among other reasons, the lack of information regarding hazardous conditions and lack of rule

13  enforcement including "dogs off leash."  (Compl. 42.)  Thereafter, Plaintiff alleges that on

14  January 4, 2019, Yosemite officials announced on its website that "all section of the John Muir

15  Trail and Mist Trail are closed.  There is no trail access to Vernal or Nevada Fall."  (Compl. ¶

16  43.)  Plaintiff alleges upon information and belief that this was a belated acknowledgement by

17  NPS officials that it was reckless to allow access to the John Muir Trail and Falls without

18  appropriate supervision; enforcement of Park Rules, and availability of emergency response

19  services.  (Id.)

20      **B.    Procedural Background**

21      Plaintiff filed this action on March 3, 2023.  (ECF No. 1.)  On August 18, 2023,

22  Defendant filed a motion to dismiss this action for lack of jurisdiction, pursuant to Federal Rule

23  of Civil Procedure 12(b)(1).  (ECF No. 13.)  The motion was referred to the assigned Magistrate

24  Judge for the preparation of findings and recommendations and other appropriate action.  (ECF

25  No. 14.)  A hearing on the motion was set for October 4, 2023.

26      On September 12, 2023, Plaintiff filed a notice of non-opposition to the motion to

27  dismiss.  (ECF No. 15.)  The notice of non-opposition states that Plaintiff "will not be filing a

28  Brief In Opposition to the United States' Motion To Dismiss based upon the additional factual

information provided." (Id.)  The notice did not address, for example, leave to amend or whether Plaintiff would be voluntarily dismissing this action for lack of jurisdiction.  Thus, given the referral of this matter for findings and recommendations and the Plaintiff's non-opposition, on September 13, 2023, the Court vacated the hearing in this matter, and notified the parties that that Defendant need not file a reply brief and that if the parties did not otherwise advise the Court of a different status by September 19, 2023, the Court would issue findings and recommendations on the unopposed motion.  (ECF No. 16.)  That deadline has now passed and the parties made no additional filings.

### III.

### LEGAL STANDARD

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to file a motion to dismiss based upon lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  A jurisdictional attack under Rule 12(b)(1) may be either facial or factual.  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  A facial attack challenges the allegations in the complaint, asserting they are insufficient on their face to invoke federal jurisdiction.  Id.  A factual attack challenges the truth of the allegations that would otherwise invoke federal jurisdiction.  Id.

"In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."  Id.; see also St. Clair v. City of Chico, 880 F.2d 199, 201 (1989) ("Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court."); Robinson v. United States, 586 F.3d 683, 685 (9th Cir. 2009) ("A district court may "hear evidence regarding jurisdiction" and "resolv[e] factual disputes where necessary." (quoting Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983))).

"When subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion."  Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 499 (9th Cir. 2001) (citing Stock

1  West, Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989)); see also Robinson v.

2  United States, 586 F.3d 683, 685 (9th Cir. 2009) (same); Castillo v. Cartier, No.

3  118CV01139LJOSAB, 2018 WL 6603864, at *2 (E.D. Cal. Dec. 17, 2018) (same).  Further, "[i]f

4  the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss

5  the action."  Fed. R. Civ. P. 12(h)(3).

6       Sovereign immunity is jurisdictional in nature," and the "terms" of the United States'

7  "consent to be sued in any court define that court's jurisdiction to entertain the suit."  F.D.I.C. v.

8  Meyer, 510 U.S. 471, 475 (1994) (citations omitted).  "Federal sovereign immunity insulates the

9  United States from suit 'in the absence of an express waiver of this immunity by Congress.' "

10 Robinson, 586 F.3d at 685 (quoting Block v. North Dakota, 461 U.S. 273, 280 (1983)); Meyer,

11 510 U.S. at 475 (same).

12                                              **IV.**

13                                        **DISCUSSION**

14      As noted above, in addressing a Rule 12(b)(1) factual attack on jurisdiction, the Court

15 court may review evidence beyond the complaint.  See Safe Air, 373 F.3d at 1039; Robinson,

16 586 F.3d at 685.  Also as noted above, Plaintiff's notice of non-opposition states that Plaintiff

17 would not be filing an opposition "based upon the additional factual information provided."

18 (ECF No. 15.)[1]  Given the non-opposition based on such additional facts, and challenge thereto,

19 the Court proceeds on the basis that the additional facts provided in the motion to dismiss are

20 undisputed.[2]

21      The Court now turns to the factual information and limited legal proffers that the motion

22 to dismiss contains pertaining to Yosemite generally, in relation to the budget, the shutdown, and

23 ─────────────

24 [1] Local Rule 230(c) provides that "[a] responding party who has no opposition to the granting of the motion shall serve and file a statement to that effect, specifically designating the motion in question."  The Court notes that the non-opposition was filed one-day late, and that the Local Rule 230(c) additionally provides that "[a] failure to file a

25 timely opposition may also be construed by the Court as a non-opposition to the motion.

26 [2]  The facts the Court utilizes from the motion to dismiss are supported by declarations attached to motion, and which additionally contain exhibits and photographic evidence as described in the declarations.  First is a declaration

27 of Teresa Austin, employed as the Deputy Superintendent of Yosemite, in that position since May of 2018, and employed by the NPS since June of 2005.  (Decl. Teresa Austin ("Austin Decl.") ¶ 1, ECF No. 13-1 at 1.)  Second, there is a declaration of Jessica Bowron, employed as the Comptroller of the NPS since January 2017, and employed

28 by the NPS since 2007.  (ECF No. 13-3 at 1.)

1   the facts as related to the death that occurred on December 25, 2018.

2       **A.     Defendant's Relevant Background Factual and Legal Proffers**

3           1.    Yosemite National Park Generally[3]

4           Yosemite law enforcement rangers manage safety and emergency response in the park.

5   Those rangers are divided over three districts in the park.  The Yosemite Valley district is at the

6   center of the park.  It includes some of the park's most popular hiking trails, including the trail

7   on which Conner's December 25, 2018 incident occurred.  The park's ranger staff is enhanced

8   by seasonal employees in the summer months, but on a typical afternoon in December, the

9   Valley District will have three to five rangers on-duty, including the supervisor.  The ranger staff

10  are responsible for law enforcement and emergency needs including search and rescue, and all of

11  Yosemite's rangers are emergency medical technician (EMT) certified.  During the months in

12  which wildfire risk is amplified, Yosemite has helicopter operations available on an exclusive-

13  use basis with an aviation contractor.  During the months when the exclusive-use helicopter

14  contract is in effect, the helicopters are available to assist in search and rescue services in the

15  park.  The Yosemite exclusive-use helicopter arrangement is not in effect in December, and was

16  not in effect in December 2018, regardless of the federal shutdown.

17          Yosemite features 750 miles of trails that facilitate visitor experience of the park's

18  dramatic elevations, waterfalls and geologic features, and ecology.   Visitor conduct on

19  Yosemite's trails is subject to the provisions of Title 36, Chapter 1 of the Code of Federal

20  Regulations, as supplemented by the Yosemite Superintendent's Compendium.  Enforcement of

21  these rules falls to the park's law enforcement rangers.   The park also employs interpretive

22  rangers who serve a visitor-relations function.   They may help guide visitors to be compliant

23  with the regulations and park rules.   But these staff are predominantly seasonal, summer

24  employees and do not patrol trails in the winter months.  Given the 750 miles of park trails, park

25  staff interaction with visitors on trails is uncommon—particularly in the winter when seasonal

26  staff are not on duty.  Rangers are not posted at trailheads to supervise hikers or ensure that they

27  _____

28  [3]  The facts contained in this section are supported by the declaration of Teresa Austin.  (See Mot. 9-11; Austin Decl. ¶¶ 4-13.)

1   are adhering to the park's posted rules and safety advisories.

2        In accordance with 36 C.F.R. § 2.15 and the Yosemite Superintendent's Compendium,

3   pet dogs are prohibited on all trails at Yosemite—there are no "dog-friendly" hiking trails in the

4   park.  This is because dogs, even if on a leash, pose a safety to risk to their owners, other visitors,

5   and the park's wildlife and plant life.  Along with the posted and publicly available compendium,

6   the park's prohibition of pets on trails is (and was in December 2018) posted on Yosemite's web

7   site, posted at the entrance gates, and posted in numerous trail locations including at trailheads

8   and on the park's various trail distance signs.[4]  Having a pet dog on a trail at Yosemite is subject

9   to federal criminal penalty under 36 C.F.R. § 2.15.[5]  (Mot. 11.)

10        **a.**    **Court's Clarification Regarding Pet Friendly Trail Advisements**

11        Defendant notes that the park's webpage features a "Plan Your Visit" tab with a section

12   on pets that notifies visitors that "pets are not allowed on any trails in Yosemite." (Mot. 11 n.16,

13   citing  https://www.nps.gov/yose/planyourvisit/pets.htm.)   Defendant  additionally  proffers  that

14   the park's pet advisory was the same on December 25, 2018 as of the filing of the motion.  (Mot.

15   11 n.16; Austin Decl. at ¶ 13.)  The Court notes the advisory states pets are not allowed: "On

16   trails,  including  the  trail  to  Vernal  Fall,  even  if  carried  (however,  pets  are  allowed  on  the

17   Wawona Meadow Loop)."  See https://www.nps.gov/yose/planyourvisit/pets.htm (last accessed

18   September 21, 2023).

19        Another  NPS  webpages  describes  the  "Wawona  Meadow  Loop  Trailhead."   See

20   https://www.nps.gov/places/000/wawona-meadow-loop-trailhead.htm  (last  accessed  September

21   21, 2023).  The website continues to describe the trail as an unpaved fire road, that allows for

22   bikes, horses, and pets: "Take a relaxing stroll along a trail that offers breathtaking views of the

23   Wawona Basin.  Walk on the paved road across the Wawona Golf Course.  Once across the golf

24   course, take a left at the sign-posted trailhead.  The trail is an unpaved fire road which loops

25   _____

26   [4]

27   [5]  This provision states the following is prohibited: "Possessing a pet in a public building, public transportation
     vehicle, or location designated as a swimming beach, or any structure or area closed to the possession of pets by the

28   superintendent."  36 C.F.R. § 2.15.  The section falls under Title 36 Parks, Forest, and Public Property; Chapter I
     National Park Service, Department of the Interior; and Part 2 Resource Protection, Public Use and Recreation.

1  around the meadow and returns to the Wawona Road.  You will be sharing the trail with horses,

2  bicyclists, and those that wish to hike with their pets, so please be courteous of others."  Id.

3  Thus, to be clear, the Wawona Meadow Loop is described as one pet-friendly "trail" in Yosemite

4  on the NPS website.

5         Additionally, the Court notes that at least the paved section of the Mirror Lake trail is

6  described as pet-friendly: "Leashed pets, bicycles, and strollers are allowed on the first paved

7  mile of the trail.  Beyond that, they are prohibited."  See https://www.nps.gov/places/000/mirror-

8  lake-trailhead.htm (last accessed September 21, 2023).  This allowance on the paved section of

9  the "trail" appears in accord with the general pet/trail website cited by Defendant, that provides

10  that pets are allowed "[o]n fully paved roads, sidewalks, and bicycle paths (except when signed

11  as not allowing pets)."  See https://www.nps.gov/yose/planyourvisit/pets.htm.

12         These small caveats to the proffer of a blanket restriction of pets on "trails" does not alter

13  the Court's recommendation to grant the motion to dismiss.

14         2.      NPS Policy Regarding Safety in National Parks[6]

15         Created in 1916 by the NPS Organic Act, the NPS is charged by Congress to "conserve

16  the scenery, natural and historic objects, and wild life" under its care to provide for their

17  enjoyment and to leave them "unimpaired for the enjoyment of future generations."  (Mot. 11,

18  quoting 54 U.S.C. § 100101(a).)  NPS's mission requires a balance between conservation and

19  enjoyment and to carry out that mission, and NPS uses a three-tiered policy structure led by the

20  NPS Management Policies.  (Mot. 11.)  Such policies expressly recognize that national parks

21  contain hazards, and that safety is a responsibility shared by the NPS and park visitors.  (Mot. 11;

22  Austin Decl. ¶ 15 (citing NPS Management Policies § 8.2.5.1 ("Park visitors must assume a

23  substantial degree of risk and responsibility for their own safety when visiting areas that are

24  managed and maintained as natural, cultural, or recreational environments")).)  The Management

25  Policies further recognize that managing safety within national parks requires discretion at the

26  / / /

27  _____

[6]  The facts and law contained in this section are derived from the motion as supported by the declaration of Teresa

28  Austin.  (See Mot. 9-11; Austin Decl. ¶¶ 15-16; NPS Director's Order #50C, Public Risk Management Program at §
1.1, p. 2, https://www.nps.gov/subjects/policy/upload/DO_50C_5-7-2010.pdf.)

park level to meet the individual challenges that each park may provide:

> These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs or artificial lighting, distribute weather warnings or advisories, initiate search-and-rescue operations or render emergency aid, eliminate potentially dangerous animals, close roads and trails or install guardrails and fences, and grant or deny backcountry or climbing permits.

(Id.)  The NPS Director's Orders underscore individual park discretion to manage public safety, and specifically NPS Director's Order #50C provides that "the means by which public safety concerns are to be addressed in each park falls under the discretion of the park's superintendent" who "must make discretionary decisions that balance public recreation and safety with preservation of the protected natural, historic, or cultural setting.  While the NPS will strive to minimize the frequency and severity of visitor mishaps along with the associated pain, suffering, and financial expense, ultimately, visitors are responsible for their own safety." (Mot. 12; Austin Decl. ¶¶ 16, citing NPS Director's Order #50C, Public Risk Management Program at § 1.1, p. 2, https://www.nps.gov/subjects/policy/upload/DO_50C_5-7-2010.pdf.)

Defendant proffers that because of these policies, determinations about when and where to post warnings on Yosemite trails, when specific trails are open to the public, and how to conduct park search and rescue operations are discretionary; and such determinations require weighing visitor safety and impact on the park's natural, historic, and cultural resources as well as limitations on park staff and financial resources.  (Mot. 12.)

3.    NPS Contingency Plan for Lapse of Federal Appropriations 2018

Like most federal agencies, the NPS's operating budget is appropriated annually through appropriations bills passed by Congress and signed into law by the president.  (Mot. 12; Bowron Decl. ¶ 4.)  When Congress fails to pass new appropriations or otherwise extend existing funding levels through a continuing resolution, an appropriations lapse occurs, and when that happens, the NPS generally cannot incur new obligations.  (Mot. 12-13.)  The NPS must furlough most of its staff but for certain "excepted" staff authorized to remain on duty to meet essential needs.

1  (Mot. 13; Bowron Decl. ¶ 5.)

2       A budget dispute led to a 17-day shutdown in October 2013.  (Mot. 13.)  Based on

3  contingency plans in place at the time, the NPS closed national parks by closing physical gates,

4  posting notice that entry is prohibited, and ordering concessions and other third-party operators

5  in the national park system to cease operations, a decision that drew partisan criticism.  (Mot. 13;

6  Bowron Decl. ¶ 6.)

7       Under a new administration, Congressional budget disputes again raised the possibility of

8  federal shutdown in fiscal year 2018, and agencies updated their contingency planning.  (Mot.

9  13.)  The new administration determined that NPS's contingency plan would change and would

10  allow many parks (including Yosemite) to remain accessible to the public and allow

11  concessioners and other third-party operators within those parks to continue operating.  (Mot. 13;

12  Bowron Decl. ¶ 7.)  Thus, Yosemite would remain "open" in the sense that its gates were not

13  closed, and some concessions continued in the park, however, most NPS employees would be

14  furloughed, including visitor-relations, fee collection, and maintenance staff; and Yosemite

15  would be unable to collect fees or provide customary park services, and visitors would enter the

16  park at their own risk.  (Mot. 13; Bowron Decl. ¶ 8.)

17       On January 19, 2018, as the January 2018 shutdown loomed, the NPS finalized the

18  National Park Service Contingency Plan, 2018.  (Mot. 13; Bowron Decl. ¶ 9.)  That same day,

19  the Department of the Interior submitted the plan to the OMB and posted the plan on the

20  Department's shutdown guidance page, and as signals from Congress continued to confirm that a

21  shutdown would commence at midnight that night, the NPS Director's Washington Support

22  Office (WASO) issued service-wide guidance to parks to post standard signage at the entrance

23  and access points.  (Mot. 13; Bowron Decl. ¶ 10, Ex. 2-B; Austin Decl. ¶ 19.)  The signage

24  included the following language: "It is not feasible to close or otherwise prohibit all access to

25  NPS properties.  Park visitors are advised to use extreme caution if choosing to enter NPS

26  property, as NPS personnel will not be available to provide guidance, assistance, maintenance, or

27  emergency response.'  (Id.)

28       Defendant notes that the NPS's policy shift regarding park access during federal

1    shutdown, and the fact that visitors could visit national parks without fee, albeit at their own risk,

2    was well-covered by the news media—including in California with news about Yosemite and

3    other parks in the state.  (Mot. 14 (citations omitted).)

4          Less than a year later in December 2018, a new budget impasse signaled another

5    impending federal shutdown.  Defendant proffers the events leading to the shutdown were

6    widely covered national news; that at Yosemite, the park's shutdown team prepared to execute

7    the NPS contingency plan, which was unchanged from January.  (Mot. 14-15; Austin Decl. ¶ 17;

8    Bowron Decl. ¶ 11.)  Within hours of the official federal appropriations lapse at midnight on

9    December 22, 2018, the main NPS website and Yosemite's website featured a banner that

10   advised the public of the federal shutdown, and stating that, while some parks would remain

11   accessible, NPS services would not be provided.  (Mot. 15.)  Yosemite contingency operations

12   placed park staff on furlough and posted notice of the park's shutdown posture, including on its

13   website and social media.  (Mot. 15.)  The sign notifying visitors that park entry was at their own

14   risk was posted on entry gates.  (Id.; Austin Decl. ¶ 19; Bowron Decl. ¶ 11.)  The park's law

15   enforcement ranger and rescue staff remained on-duty as safety personnel excepted from the

16   furlough.  (Mot. 15; Austin Decl. ¶ 20.)

17        4.    Defendant's Primary Factual Contentions as to Events of December 25, 2018

18         Conner and his girlfriend parked their vehicle at the Happy Isle Trailhead in Yosemite on

19   Wednesday, December 25, 2018—three days into the federal shutdown.  (Mot. 15; Compl. ¶

20   29.)[7]  Despite the park's posting of signs, website, and social media information, and media

21   coverage, Plaintiff alleges that upon Conner's arrival to Yosemite, "there were no signs advising

22   them that there were no visitor's services available, nor that emergency and rescue services

23   would be limited due to the government shut-down."  (Compl. ¶ 30.)  Defendant submits that

24   entering the park, however, Conner would have driven through an open arm-gate with an

25   unoccupied fee-collection booth, paying no fee to enter the park and at his own risk—as

26   explained by the WASO federal shutdown warning sign posted on the booth.  (Mot. 15; Austin

27

28   [7]  According to Plaintiff's administrative claim, Conner arrived at the park the day before, December 24, 2018, and
     stayed in overnight lodging.  (Mot. 15 n.31; Austin Decl. ¶ 21.)

1 Decl. ¶¶ 18, 19, 21.)

2      After Conner parked near the Happy Isles trailhead to go hiking with his girlfriend and

3 two dogs, the group set off on the John Muir trail.  (Mot. 15; Compl. ¶ 31.)  While Plaintiff

4 alleges that Conner "saw no signs nor received any instruction that dogs were not permitted on

5 the trail" (Compl. ¶ 31), Defendant contends that if Conner did not see the signs that dogs are not

6 permitted on trails in Yosemite, it was because he was not looking because between where

7 Conner parked and where he began hiking down the John Muir Trail, Conner passed four signs

8 indicating that dogs are prohibited on the trails, and immediately adjacent to the road that

9 separates that parking lot and the trailhead, Conner passed a sign with a "no-dogs" graphic.

10 (Mot. 15-16; Austin Decl. ¶ 23, Ex. 1-B.)  Then, as Conner made his way past the trailhead and

11 down the trail, he would have passed trail information signs with notice of the park's prohibition

12 of pets on trails, and a graphic sign indicating that dogs are prohibited.  (Mot. 17; Austin Decl. ¶

13 23, Exs. 1-C, 1-D.)

14      Notwithstanding such signage and web-site information prohibiting pet dogs on any trails

15 in Yosemite, Conner and his girlfriend began their hike with two dogs, off-leash.  According to

16 the Complaint and park incident-report documents, around 2:30 p.m. the couple and their two

17 dogs were above the Silver Apron (an area of swift-moving water through a large rock

18 formation).  (Mot. 18.)  One of the couple's dogs "had gone off the trail."  (Compl. ¶ 34.)  When

19 Conner left the trail to retrieve the dog, both fell into the moving water, and Conner struck his

20 head on the rocks as he fell into the Merced River below.  (Mot. 18.)

21      As Conner's girlfriend yelled for him, other hikers below the Silver Apron heard the

22 commotion and called 9-1-1.  At 2:42 p.m., the Yosemite emergency incident commander center

23 received report of the call.  (Mot. 18; Austin Decl. ¶ 24.)  The command center dispatched a team

24 of emergency responders on foot, the first of which arrived on the scene at 3:22 p.m.  (Mot. 18;

25 Austin Decl. ¶ 25.)  After additional responders arrived, they attempted to secure a helicopter

26 medical evacuation through the California Highway Patrol in Paso Robles, but impending

27 darkness made the rescue flight unavailable.  (Id.; Compl. ¶ 38.)  Defendant contends that

28 contrary to Plaintiff's "information or belief" allegations (Compl. ¶ 36), the Yosemite exclusive-

use helicopter does not operate in winter with or without a federal shutdown.  (Mot. 18; Austin Decl. ¶ 10.)   At approximately 5:50 p.m., rescuers ceased resuscitation and Conner was pronounced dead.

In attending to Conner, NPS rangers found a small case attached to Conner's wrist that contained powder and capsules that appeared to be illicit drugs.  (Mot. 18.)   Thereafter, the Stanislaus County Coroner performed an autopsy that concluded Conner died of "craniocerebral injuries sustained in a fall."  (Id.)   The autopsy further opined that "the contributory factor of death was cardiomyopathy.  He had been consuming amphetamine prior to death."  (Id.)   The coroner's toxicology screen came back positive for amphetamine and benzodiazepine.  (Mot. 18.)

**B.      The Court Recommends Granting Defendant's Motion to Dismiss**

Against the above framing of the allegations and relevant facts, and in light of the additional facts and law noted above, Plaintiff presents two primary legal challenges.  First, Defendant argues the Court lacks jurisdiction because California's recreational immunity statute, Cal. Civ. Code § 846, would bar Plaintiff's claim against a private landowner, and that statute therefore bars the FTCA claim against the United States.  Second, the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), retains federal sovereign immunity for discretionary executive branch decisions that implicate policy considerations such as those Plaintiff challenges here, and therefore sovereign immunity bars Plaintiff's claim under the discretionary function exception.  Defendant submits that these are two independently sufficient reasons demonstrate the Court lacks jurisdiction and Plaintiff's complaint must be dismissed.

1.      The Court Finds in Agreement with Defendant that California's Recreational Immunity Statute Bars the FTCA claim against the United States

**a.      FTCA Generally**

Again, sovereign immunity is jurisdictional in nature," and the "terms" of the United States' "consent to be sued in any court define that court's jurisdiction to entertain the suit." Meyer, 510 U.S at 475 (citations omitted).  Before a district court may exercise jurisdiction over any suit against the government, it must have "a clear statement from the United States waiving

sovereign immunity, together with a claim falling within the terms of the waiver." Jachetta v. United States, 653 F.3d 898, 904 (9th Cir. 2011) (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003)).

The FTCA authorizes private suits against the United States for damages for loss of property, injury, or death, providing in relevant part:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); see also Gonzalez v. United States, 814 F.3d 1022, 1026 (9th Cir. 2016). Congress passed the FTCA in 1946, waiving the sovereign immunity of the United States for certain torts committed by federal employees acting within the scope of their employment. Id. at 475-76; Brownback v. King, 141 S. Ct. 740, 746 (2021). The FTCA is "a limited waiver of sovereign immunity from suits for negligent or wrongful acts of government employees . . . which constitute 'ordinary common-law torts,' [and thus] the United States is liable for tort claims 'in the same manner and to the same extent as a private individual under like circumstances.' " Gonzalez, 814 F.3d at 1026 (internal citations and quotation marks omitted).

Plaintiffs are required to bring claims under the FTCA in federal district court. Brownback, 141 S. Ct. at 746. "Federal courts have jurisdiction over these claims if they are 'actionable under § 1346(b).' " Brownback, 141 S. Ct. at 746 (quoting Meyer, 510 U.S at 477). "A claim is actionable if it alleges the six elements of [28 U.S.C.] § 1346(b), which are that the claim be: '[1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' " Id.

"[E]ven though a plaintiff need not *prove* a § 1346(b)(1) jurisdictional element for a court

1  to maintain subject-matter jurisdiction over his claim . . . a plaintiff must plausibly allege all six

2  FTCA elements not only to state a claim upon which relief can be granted but also for a court to

3  have subject-matter jurisdiction over the claim." <u>Brownback</u>, 141 S. Ct. at 749 (emphasis in

4  original) (citing <u>Meyer</u>, 510 U.S at 477). "That means a plaintiff must plausibly allege that 'the

5  United States, if a private person, would be liable to the claimant' under state law both to survive

6  a merits determination under Rule 12(b)(6) *and* to establish subject-matter jurisdiction."

7  <u>Brownback</u>, 141 S. Ct. at 749 (emphasis added) (although "[i]n most cases, a plaintiff's failure to

8  state a claim under Rule 12(b)(6) does not deprive a federal court of subject-matter jurisdiction . .

9  . [b]ecause King's tort claims failed to survive a Rule 12(b)(6) motion to dismiss, the United

10 States necessarily retained sovereign immunity, also depriving the court of subject-matter

11 jurisdiction."); <u>see also</u> <u>United States v. Olson</u>, 546 U.S. 43, 45–46 (2005) ("The Act says that it

12 waives sovereign immunity 'under circumstances where the United States, if a *private person*,'

13 not 'the United States, if a state or municipal entity,' would be liable . . . [and] [o]ur cases have

14 consistently adhered to this 'private person' standard." (emphasis in original)); <u>Jachetta</u>, 653

15 F.3d at 904 ("party seeking federal jurisdiction ... must therefore demonstrate that Alaska law

16 would recognize a [tort] cause of action ... against a private individual for like conduct." (quoting

17 <u>Bolt v. United States</u>, 509 F.3d 1028, 1031 (9th Cir. 2007))).

18      **b.    The Court Finds the FTCA's Private-Person Liability Standard Divests the
             Court of Jurisdiction Under California's Recreational Immunity Statute**
19

20      Defendant argues California's recreational immunity statute, Cal. Civ. Code § 846, would

21 prevent Plaintiff from suing a private landowner for wrongful death under these circumstances.

22 The Court finds in agreement with Defendant based on the above law pertaining to the FTCA's

23 private-person liability standard, the Court's review of the California's recreational immunity

24 statute below, as applied to the facts of this case, and considering Plaintiff's statement of non-

25 opposition.

26      The California statute provides that: "An owner of any estate or any other interest in real

27 property, whether possessory or nonpossessory, owes no duty of care to keep the premises safe

28 for entry or use by others for any recreational purpose or to give any warning of hazardous

1  conditions, uses of, structures, or activities on those premises to persons entering for a
2  recreational purpose, except as provided in this section." Cal. Civ. Code § 846(a).  California's
3  recreational immunity statute "was enacted to encourage property owners to allow the general
4  public to engage in recreational activities free of charge on privately owned property." Hubbard
5  v. Brown, 50 Cal. 3d 189, 193 (1990) (citations omitted).

6      "A 'recreational purpose,' . . . includes activities such as . . . hiking . . . sightseeing . . .
7  nature contacting . . . and viewing or enjoying . . . scenic [or] natural . . . sites." Cal. Civ. Code §
8  846(b).  The Supreme Court of California has also held the statute applies to recreational
9  trespassers on land not suitable for recreation.  See Ornelas v. Randolph, 4 Cal. 4th 1095, 1105
10  (1993) (noting that while "several Courts of Appeal have concluded the Legislature could not
11  rationally have intended to immunize owners of property unsuited for recreation, even if in fact
12  the property was used for such a purpose at the time of the accident," finding "[r]eason and logic
13  do not, however, compel such a conclusion [as] [t][he Legislature could reasonably determine
14  that a landowner—any landowner—should not in fairness be held liable for injuries sustained by
15  a trespasser from the recreational use of the owner's property [and] [t]he statute, in short, may be
16  read to mean precisely what it says.").

17      The California statute provides for exemptions, and "does not limit the liability which
18  otherwise exists for any of the following:"

19          (1) Willful or malicious failure to guard or warn against a
20          dangerous condition, use, structure or activity.

21          (2) Injury suffered in any case where permission to enter for the
            above purpose was granted for a consideration other than the
            consideration, if any, paid to said landowner by the state, or where
22          consideration has been received from others for the same purpose.

23          (3) Any persons who are expressly invited rather than merely
            permitted to come upon the premises by the landowner.
24

25  Cal. Civ. Code § 846(d)(1)-(3).

26      Having no opposition before the Court, the Court finds sufficient support that
27  California's recreational immunity statute applies to the United States as a defendant in FTCA
28  cases.  See Ravell v. United States, 22 F.3d 960, 961-63 (9th Cir. 1994) ("The law of California .

. . declares that when Ravell, a member of the general public, came onto the Norton Air Force Base without a direct personal invitation, the United States did not owe her a duty of care to make the flight line safe for her use."). The Court finds the discussion in <u>Mace</u> of the interplay of the FTCA and state recreational statutes, in relation to courts that applied such analysis to a 12(b)(6) motion to dismiss and motion for summary judgment, to be instructive here for application to the 12(b)(1) motion:

> For example, in *Hannon v. United States*, 801 F. Supp. 323 (E.D. Cal. 1992), the court held that, under the FTCA, the United States must be afforded the same defense to liability as a private person would under California's "recreational use" statute (Cal. Civ. Code § 846) — even if, as the plaintiff claimed, that statute did not protect public entities. *Id.* at 325-26. The defensive statute undeniably did cover private entities, consequently shielded the United States "in the same manner" through the FTCA, and thus warranted summary judgment against the plaintiff's claim. *Id.* (discussing *Simpson, supra*).
>
> The same effective result obtained in *Proud v. United States*, 723 F.2d 705 (9th Cir. 1984). The plaintiff in *Proud* was injured while diving in a national park in Hawaii. *Id.* at 705-06. Like California, Hawaii had a "recreational use" statute that shielded landowners from the sorts of claims that the *Proud* plaintiff made; Hawaii's version of this statute, however, expressly withheld its protection from publicly owned land. *Id.* at 706. The Ninth Circuit held that this did not matter given the FTCA; the United States had to be treated like a private entity and so could invoke the protective statute. *Id.* at 706-07. The *Proud* court affirmed a Rule 12(b)(6) dismissal of the complaint. *Id.*

<u>Mace v. United States</u>, No. 15-CV-04060-LB, 2015 WL 8770677, at *3 (N.D. Cal. Dec. 15, 2015).

As Defendant notes, the Ninth Circuit has upheld application of the California law to national parks. <u>See, e.g.</u>, <u>Mattice By & Through Mattice v. U.S., Dep't of Interior</u>, 969 F.2d 818, 822 (9th Cir. 1992) ("Here, the 'premises' is a national park, a tract of land ideally suited for recreation[;] [a]pplication of the statute in this situation is not absurd because it will encourage the government to keep park land open for recreational use [and] [t]he government is protected from liability for negligence by the recreational use statute.").

Similarly, Defendant also proffers that courts regularly apply the recreational immunity statute to bar claims based on incidents in national parks when no entry fee was paid. (Mot. 21,

citing <u>Mattice</u>, 969 F.2d at 818 (Redwood National Park); <u>Spires v. United States</u>, 805 F.2d 832, 834 (9th Cir. 1986) (Golden Gate National Recreation Area); <u>Wettstein v. United States</u>, No. 95-15156, 1995 WL 641353, at *1 (9th Cir. Oct. 31, 1995) (same).)  However, the Court notes that while it may be true these locations do not charge entry fees, the cases do not expressly discuss the absence of fees in the analysis.  It appears these areas may have some form of open access from general roadways.  Further, the Court notes that <u>Wettstein</u> is an unpublished opinion that does not appear to fall under any applicable exception for citation under the Ninth Circuit rule.[8]

Turning to the facts at hand, the Court agrees with Defendant that Conner was engaged in a "recreational purpose" when he fell after leaving the hiking trail in Yosemite while attempting to retrieve his unleashed dog (Compl. ¶ 30).  <u>See</u> Cal. Civ. Code § 846(b) ("recreational purpose" broadly to include sightseeing, nature contacting, and hiking).

Defendant argues that Plaintiff does not plead—nor could she plausibly allege—that any of the three exceptions to California's recreational immunity statute applies.  Aside from the Court's discussion of the fee exception below, which Plaintiff never raised, the Court finds no apparent exception to the California statute applicable under the facts here.  Based on the non-opposition, the Court has been presented no argument from Plaintiff that Plaintiff could plead the application of any exception if granted leave to amend, and thus finds in accord with Defendant, and recommends below that this action should be dismissed with prejudice and without leave to amend.

First, if Conner *had* paid an entrance fee for the park, California's exception for "[i]njury suffered in any case where permission to enter for the above purpose was granted for a consideration other than the consideration, if any, paid to said landowner by the state, or where consideration has been received from others for the same purpose," could be applicable.  Cal. Civ. Code § 846(d)(1)-(3).  Here, Conner paid no fee to enter Yosemite, as the federal shutdown

---

[8]  <u>See</u>  Ninth Circuit Rule 36-3 ("Unpublished dispositions and orders of this Court issued before January 1, 2007 may not be cited to the courts of this circuit, except in the following circumstances . . . when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion . . . for factual purposes, such as to show double jeopardy, sanctionable conduct, notice, entitlement to attorneys' fees, or the existence of a related case . . . [or] in a request to publish a disposition or order made pursuant to Circuit Rule 36-4, or in a petition for panel rehearing or rehearing en banc, in order to demonstrate the existence of a conflict among opinions, dispositions, or orders.").

1    resulted in the furlough of most park staff including fee collection staff, and no fees were

2    collected from visitors during the shutdown beginning December 22, 2018.  (See Austin Decl. ¶¶

3    19-21.)

4            "The rationale for this exception to immunity is that the landowner who derives an

5    economic benefit from opening land to public recreation has an incentive to do so, coupled with

6    some financial ability to take safety precautions; by contrast, the landowner who derives no

7    profit from permitting public recreation would likely close his land to public recreation if faced

8    with liability for mere negligence."  Colin v. United States, No. C-99-5045 EDL, 2001 WL

9    776998, at *11–12 (N.D. Cal. May 17, 2001), aff'd, 56 F. App'x 831 (9th Cir. 2003).  The court

10   in Colin explained the Ninth Circuit law pertaining to the parameters of the exception, where a

11   fee for use of one area of aspect of an area of land, *may* extend to other areas or uses, or shared

12   profits from things such as concessionaires can invoke the exception:

13          Furthermore, it is undisputed that the United States did not charge
     any fee for day use of the swimming and picnic facilities at Lake
14   Sonoma; use like Plaintiff's was free of charge. Rather, the United
     States only charged a fee for overnight camping and boat
15   launching.

16          Plaintiff's attempt to rely on *Graves v. United States Coast Guard,*
     692 F.2d 71 (9th Cir.1982) is unavailing. There, the plaintiff sued
17   under the FTCA for injuries from diving off a cabana into a river.
     He gave money to his traveling companion, who in turn paid the
18   government's lessee for the privilege of camping near the river. *Id.*
     at 73. The Ninth Circuit held that California Civil Code section
19   846 did not shield the government from liability because
     permission to use the land was granted for consideration. The court
20   reasoned that by paying for the cabana, the plaintiff also got access
     to the river. *Id.* Here, by contrast, Plaintiff and his companions
21   paid no fee to obtain access to the lake, either directly or indirectly.

22          This case is also unlike *Ducey,* 713 F.2d at 512, where all the
     plaintiffs had regularly purchased goods from the café-store and all
23   but one had rented boat slips or trailer spaces. Although visitors to
     the national recreational area paid no direct fee to enter, the Ninth
24   Circuit held that the government's receipt of one and three-fourths
     percent of its concessionaire's gross annual receipts from sales at
25   the café-store and from boat slip and trailer space rentals located on
     government property constituted consideration under the Nevada
26   Recreational Use statute immunity exception. *Id.* at 509–10.[3] The
     Ninth Circuit reasoned that such a broad reading of the statute
27   comported with the general policy of "differentiating the
     entrepreneur-landowner whose land is open for business reasons
28   from the landowner whom the statute encourages to open his land

1
2
3

on a gratuitous basis by the promise of immunity." *Id.* at 514; *but see Jones v. United States,* 693 F.2d 1299, 1303 (9th Cir.1982) (finding that although the plaintiff paid a fee to rent an inner tube, no fee was charged for entry on the land or for use of the land, rendering the consideration exception inapplicable).

4   Colin, No. C-99-5045 EDL, 2001 WL 776998, at *11–12.  There are no apparent facts that

5   directly correlate with the above examples, as no fees were paid due to the government

6   shutdown, and no other allegations of moneys expended.

7          The court considers the last clause of this exception, of "where consideration has been

8   received from others for the same purpose."  Cal. Civ. Code § 846(d)(2).  There could be an

9   argument that consideration was received from others for the same purpose, if Plaintiff were to

10  argue that consideration is typically received from others for the same purpose of entering

11  through the gates and utilizing the park as a whole, during a time of no government shutdown.[9]

12  Of course there was a shutdown, no fees were being received, specialized warnings were placed

13  at the gate based on this fact, and therefore it is not an analogous situation.  In the absence of any

14  opposition, the Court finds the exception does not apply because no consideration was paid, and

15  nor was consideration received from others for the same purpose of entering the park *during* the

16  special conditions of the shutdown.

17         Second, Conner was not expressly invited by the United States to go hiking in Yosemite.

18  See Ravell, 22 F.3d at 963 (observing that "express invitation" for purposes of California's

19  recreational immunity statute is limited to "those persons who were personally selected by the

20  landowner").

21         Finally, the Court agrees that Plaintiff does not and could not plausibly allege that the

22  United States "willful[ly] or malicious[ly] fail[ed] to guard or warn against a dangerous

23  condition."  Cal. Civ. Code § 846(d)(1).  In this regard, as Defendant highlights, in California,

24  the standard for willfulness or maliciousness is "very high."  Armstrong v. United States, No. C

25  07-3793 SBA, 2008 WL 5047680, at *5 (N.D. Cal. Nov. 24, 2008) ("The standard for

26  willfulness and maliciousness is that of an intentional tort . . . [a]ccordingly, it is a very high

27
28

---

[9]  The Court considers this exception could potentially apply, for example, where a visitor enters the park gates after-hours when the gate is not being staffed, or an unmanned route into the park, and a visitor is expected to pay upon exit or some other point.

1  standard." (citing Spires v. United States, 805 F.2d 832, 834 (9th Cir. 1986))).   "Willful

2  misconduct" under California law, the Ninth Circuit observed in Spires, "is any intentional act of

3  an unreasonable character undertaken in disregard of a known risk or a risk so obvious that the

4  actor must be taken to have been aware of it, and so great as to make the resulting harm highly

5  probable."   805 F.2d at 834 (quoting Rost v. United States, 803 F.2d 448, 450-52 (9th Cir.

6  1986)); see also Calvillo-Silva v. Home Grocery, 19 Cal. 4th 714, 729, 968 P.2d 65, 76 (1998)

7  ("Unlike negligence, which implies a failure to use ordinary care, and even gross negligence,

8  which connotes such a lack of care as may be presumed to indicate a passive and indifferent

9  attitude toward results, willful misconduct is not marked by a mere absence of care [but] [r]ather,

10 it involves a more positive intent actually to harm another or to do an act with a positive, active

11 and absolute disregard of its consequences." (internal quotation marks and citations omitted)),

12 disapproved of on other grounds in Aguilar v. Atl. Richfield Co., 25 Cal. 4th 826, 24 P.3d 493

13 (2001).

14      Significantly, as Defendant highlights here, Conner passed[10] at least four signs warning

15 him that pets were prohibited on Yosemite's trails, and in California, posting a warning can rebut

16 the allegation that a landowner's conduct was willful or malicious.  See Mattice, 969 F.2d at 823

17 (finding plaintiff failed to offer "evidence to establish that the government consciously failed to

18 act to avoid the danger either," and noting "[t]he undisputed evidence is that the government

19 placed" multiple warning signs on the road); Manuel v. Pacific Gas & Elec. Co., 93 Cal. Rptr. 3d

20 9, 24 (Cal. Ct. App. 2009); Bacon v. Southern Cal Edison Co., 62 Cal. Rptr. 2d 16, 19 (Cal. Ct.

21 App. 1997) (warning sign and barbed wire "sufficient to show the absence of willful or malicious

22 conduct because [defendant] attempted to prevent the harm anticipated").[11]

23      The Court finds Defendant has sufficiently demonstrated that NPS responded quickly and

24 appropriately to Conner's emergency, sending medically trained law enforcement rangers to help

25 him, and that the first responder team dispatched within minutes of receiving the 9-1-1 call.  (See

---

26

27  [10]  Defendant's motion uses the word "ignored."  (See Mot. 23.)

28  [11]  Defendant's motion omitted the fact there was also barbed wire when referencing this case in the motion, only
stating Bacon held the warning sign was sufficient.  (See Mot. 23.)

1    Austin Decl. ¶¶ 20, 24, 25.)   Rangers hiked to Conner's location to render aid, working to

2    resuscitate him.   While Plaintiff alleges that Conner was deprived of the opportunity to be

3    evacuated by the NPS "exclusive use helicopter," Defendant has established such service does

4    not operate in December, regardless of whether a federal shutdown occurs.   (See Austin Decl. ¶

5    10.)

6          The Court agrees with Defendant that the NPS's determination to leave the park gates

7    open to allow access likewise could not support a finding of willful or malicious conduct

8    undertaken with the intent to harm or "positive, active, and absolute disregard" of the likelihood

9    harm would result.   Calvillo-Silva, 968 P.2d at 76.   As Defendant highlights, the NPS kept all

10   ranger and rescue staff on-duty as excepted personnel; it posted entrance-booth warning signs

11   advising extreme caution; and those signs explained that no NPS services would be provided and

12   that entering the park during the shutdown "is at the visitor's sole risk."   (See Bowron Decl., Ex.

13   2-B.)

14         Finally, Defendant argues that apart from entering the park without fee and not having

15   access to services such as the visitor's center, Conner's activities were otherwise unaffected by

16   the federal shutdown.   The Court agrees in large relevant part.   Specifically, Yosemite's ranger

17   staff are not generally posted at trailheads to supervise hiker conduct; there are no dog-friendly

18   trails in Yosemite to which he otherwise would have been directed;[12] to the contrary, hikers'

19   conduct on the trail is regulated by signage that Conner would have passed; and the NPS

20   medical-response resources were no different on that winter day than they would have been had

21   the federal shutdown not occurred.   (Austin Dec. ¶¶ 9, 10, 25.)

22         Based on the above discussion pertaining to the FTCA and California's recreational

23   immunity statute as applied to the facts here, the Court recommends the Defendant's Rule

24   12(b)(1) motion to dismiss for lack of jurisdiction be granted.   See Mace, 2015 WL 8770677, at

25   *4 ("Some of these cases analyzed and dismissed premises-liability claims against the United

26   States under Rule 12(b)(6) [however] . . . [t]he FTCA analysis resolves equally well, though, if

---

27   [12]  However, to be clear, as noted above, there are small caveats to the proffer that there are no dog-friendly "trails"
28   in Yosemite.   Whether there may have been one alternative trail that rangers could have suggested, is not
     determinative given the entire body of facts and law herein, and the lack of opposition.

1  not better, through the jurisdictional lens of Rule 12(b)(1) [as] [t]he root principle beneath the

2  FTCA is, after all, sovereign immunity; so that, if a given claim does not 'fall[ ] within the terms

3  of the [FTCA's] waiver,' the court lacks subject-matter jurisdiction over that claim." (quoting

4  Jachetta, 653 F.3d at 903)).

5          2.      The Court Finds in Agreement with Defendant that the FTCA's Discretionary
                   Function Exception Divests the Court of Jurisdiction
6

7          Defendant argues the Court lacks jurisdiction by operation of the FTCA's discretionary

8  function exception ("DFE").  Even if the above analysis pertaining to California's recreational

9  immunity statute in relation to the FTCA did not mandate dismissal, the Court finds Defendant

10 has sufficiently established application of the DFE provides an additional independent reason for

11 dismissing this action for lack of jurisdiction under the FTCA.

12         a.      The FTCA's Discretionary Function Exception

13         The FTCA's limited waiver of sovereign immunity is subject to a number of statutory

14 exceptions, and if a cause of action fall within one or more of these exceptions, then the federal

15 courts lack subject matter jurisdiction to hear the claims.  See 28 U.S.C.§ 2680; Nurse v. United

16 States, 226 F.3d 996, 1000 (9th Cir. 2000).  This provision excepts "[a]ny claim based upon an

17 act or omission of an employee of the Government, exercising due care, in the execution of a

18 statute or regulation, whether or not such statute or regulation be valid, or based upon the

19 exercise or performance or the failure to exercise or perform a discretionary function or duty on

20 the part of a federal agency or an employee of the Government, whether or not the discretion

21 involved be abused."  28 U.S.C. § 2680(a); Nurse, 226 F.3d at 1001.

22         As the Ninth Circuit recently stated, "[t]he DFE [] is an important exception to the

23 FTCA," [t]he government does not waive immunity for tort claims if the alleged tortfeasor was

24 performing a discretionary function or duty when he or she injured the plaintiff," and "[t]his is

25 true even if the employee abused that discretion."  Lam v. United States, 979 F.3d 665, 672 (9th

26 Cir. 2020) (citing 28 U.S.C. § 2680(a)); see also United States v. Gaubert, 499 U.S. 315, 325,

27 (1991) ("A discretionary act is one that involves choice or judgment; there is nothing in that

28 description that refers exclusively to policymaking or planning functions [as] [d]ay-to-day

24

1  management of banking affairs, like the management of other businesses, regularly requires

2  judgment as to which of a range of permissible courses is the wisest [and] [d]iscretionary

3  conduct is not confined to the policy or planning level.").

4       "This exception . . . 'marks the boundary between Congress' willingness to impose tort

5  liability upon the United States and its desire to protect certain governmental activities from

6  exposure to suit by private individuals.' " Berkovitz by Berkovitz v. United States, 486 U.S.

7  531, 536 (1988) (quoting United States v. Varig Airlines, 467 U.S. 797, 808 (1984)).  "It is

8  designed to 'prevent judicial second-guessing of legislative and administrative decisions

9  grounded in social, economic, and political policy through the medium of an action in tort.' "

10  Chadd v. United States, 794 F.3d 1104, 1108 (9th Cir. 2015) (quoting Varig Airlines, 467 U.S. at

11  814).  "The government bears the burden of proving that the discretionary function exception

12  applies."  Chadd, 794 F.3d at 1108 (citing Bailey v. United States, 623 F.3d 855, 859 (9th Cir.

13  2010)).

14       "The Supreme Court has established a two-step process for evaluating whether a claim

15  falls within the discretionary function exception."  Chadd, 794 F.3d at 1108-09.  "First, a court

16  examines whether the government's actions are 'discretionary in nature, acts that involv[e] an

17  element of judgment or choice.' "  Chadd, 794 F.3d at 1109 (quoting Gaubert, 499 U.S. at 322).

18  "In making this examination, it is 'the nature of the conduct, rather than the status of the actor,

19  that governs whether the discretionary function exception applies in a given case.' "  Chadd, 794

20  F.3d at 1109 (quoting Varig, 467 U.S. at 813).  "If there is . . . a statute or policy directing

21  mandatory and specific action, the inquiry comes to an end because there can be no element of

22  discretion when an employee has no rightful option but to adhere to the directive."  Chadd, 794

23  F.3d at 1109 (quoting Terbush v. United States, 516 F.3d 1125, 1129 (9th Cir. 2008)).  Where no

24  federal statute, regulation or policy prescribes a specific course of action, the challenged conduct

25  involves an element of judgment or choice.  See Berkovitz, 486 U.S. at 536.  Further, "[i]f,

26  however, the policies are not mandatory but rather directly or implicitly give discretion to the

27  employee, the DFE defense survives this first step."  Lam, 979 F.3d at 674.  Thus, the "presence

28  of a few, isolated provisions cast in mandatory language does not transform an otherwise

1  suggestive set of guidelines into binding agency regulations." <u>Lam</u>, 979 F.3d at 677 (quoting

2  <u>Gonzalez</u>, 814 F.3d at 1030).

3        Second, if the conduct involves exercising discretion, courts must next determine whether

4  "the judgment of the government employee [is] 'of the kind that the discretionary function

5  exception was designed to shield.' " <u>Teplin v.United States</u>, No.17-cv-02445-HSG, 2018 WL

6  1471907, at *4 (N.D. Cal. March 26, 2018) (quoting <u>Gaubert</u>, 499 U.S. at 322-23).  The DFE's

7  purpose is to "prevent judicial second-guessing of legislative and administrative decisions

8  grounded in social, economic, and political policy' through a tort action," and courts construe it

9  as "protect[ing] only governmental actions and decisions based on considerations of public

10  policy." <u>Id.</u> (alteration in original).  "The 'focus of the inquiry,' then, is whether the 'nature of

11  the actions taken,' pursuant to an exercise of discretion, 'are susceptible to policy analysis.' "

12  <u>Teplin</u>, 2018 WL 1471907, at *4 (quoting <u>Gaubert</u>, 499 U.S. at 325).  "[T]he challenged decision

13  'need not *actually* be grounded in policy considerations' so long as it is, 'by its nature,

14  susceptible to a policy analysis.' "  <u>Nurse</u>, 226 F.3d at 1001 (emphasis in original) (quoting

15  <u>Miller v. United States</u>, 163 F.3d 591, 593 (9th Cir. 1998)).  In <u>Whisnant</u>, the Ninth Circuit

16  commented on the difficulty of this analysis in some cases:

17
          We have recently remarked upon the difficulty of charting a clear
18            path through the weaving lines of precedent regarding what
          decisions are susceptible to social, economic, or political policy
19            analysis. *See O'Toole,* 295 F.3d at 1035. Government actions can
          be classified along a spectrum, ranging from those "totally
20            divorced from the sphere of policy analysis," such as driving a car,
          to those "fully grounded in regulatory policy," such as the
21            regulation and oversight of a bank. *Id.* (citing *Gaubert,* 499 U.S. at
          325 n. 7, 332–34, 111 S.Ct. 1267, for these examples). But
22            determining the appropriate place on the spectrum for any given
          government action can be a challenge.

23  <u>Whisnant v. United States</u>, 400 F.3d 1177, 1181 (9th Cir. 2005).  Nonetheless, "there is a

24  presumption that where the express or implied government policy 'allows a government agent to

25  exercise discretion, it must be *presumed* that the agent's acts are grounded in policy when

26  exercising that discretion.' "  <u>Lam</u>, 979 F.3d at 681 (emphasis in original) (quoting <u>Gaubert</u>, 499

27  U.S. at 324) (citing <u>Chadd</u>, 794 F.3d at 1104).

28        Thus, if both prongs of the above test are met, the DFE applies; the United States retains

1   its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed.  See Nurse,

2   226 F.3d at 1000.[13]

3       b.  **The Court finds the Discretionary Function Exception Applies to NPS**
            **Decisions of Whether to Close Yosemite During the Shutdown and**
4           **Recommends Granting Defendant's Motion to Dismiss**

5           Plaintiff alleges that the NPS should not have allowed visitors into Yosemite during the

6   federal shutdown and that it failed to warn Conner or otherwise "supervise" him by intervening

7   when he elected to take dogs off-leash on Yosemite's hiking trails.  Defendant argues the NPS

8   decisions in these areas are left to the discretion of the managers at Yosemite.  See NPS

9   Management Policies (2006) at § 8.1.2.5; NPS Director's Order 50C.  Defendant proffers the

10  Ninth Circuit has held that the DFE applies to such decisions, and that indeed, the Ninth Circuit

11  has repeatedly recognized that NPS decisions about whether to close trails and/or to post warning

12  signs are covered by DFE because they require significant discretion and judgment, requiring

13  NPS to balance competing policy considerations of maximizing access to and preserving natural

14  resources with the need to minimize potential safety hazards.  The allegations and discussion by

15  the Ninth Circuit in Childers are instructive:

16          Childers argues that the government safety manual provided: "If
            roads and trails cannot be maintained as designed and built, they
17          should either be closed or the public adequately warned." (Exhibit
            EX50, Chapter 12:1.1). Under this regulation, the NPS was
18          required either to close the trails or adequately warn the public. As
            the trail in question was not closed, the manual required adequate
19          warnings. The discretionary exception would not apply if the NPS
            ignored the safety manual's mandate that the public be "adequately
20          warned." However, decisions as *to the precise manner* in which
            NPS would warn the public as to trails which are left open, but
21          unmaintained in the winter, clearly fall within the discretionary
            function exception. As the district court observed "no regulations
22          or guidelines required the Park Service to place warnings along a
            trail." *See Childers v. United States,* 841 F.Supp. 1001, 1020
23

_____

24  [13]  Defendant also proffers that this is true even where the government may have been negligent in the performance
    of such discretionary acts, as "[n]egligence is irrelevant to the discretionary function inquiry."  Routh v. United
25  States, 941 F.2d 853, 855 (9th Cir. 1991); see also Kennewick Irr. Dist. v. United States, 880 F.2d 1018, 1029 (9th
    Cir. 1989).  To be clear, the negligent act must generally be taken as part of the discretionary function.  Whisnant,
26  400 F.3d at 1185 ("While the district court is correct to the extent that the question of *whether* the government was
    negligent is irrelevant to the applicability of the discretionary function exception . . . the question of *how* the
27  government is alleged to have been negligent is critical [as] [i]f Whisnant were claiming that the government was
    negligent in electing to employ contractors rather than doing the work itself, or in designing its safety regulations,
28  then his claim would most likely be barred; instead, he is claiming that the government negligently ignored health
    hazards that were called to its attention, and so his claim is not barred.") (emphasis in original).

(D.Mont.1993). In this case, the NPS did provide warnings through park brochures, visitor center displays, bulletin board information, and personal contacts.

Childers v. United States, 40 F.3d 973, 976 (9th Cir. 1994), as amended (Jan. 17, 1995).  The Ninth Circuit held the DFE applied, as "rangers used their discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety [and] [t]his decision was precisely the kind the discretionary function exception was intended to immunize from suit."  Id.; see also Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995) ("While the said policy guidelines certainly outline general policy goals regarding visitor safety, the means by which NPS employees meet these goals necessarily involves an exercise of discretion [and] can be considered mandatory only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions . . . guided by our prior decision in [Childers] [where] . . . we concluded that the NPS's decisions regarding warnings, trail maintenance, and trail closures were discretionary . . . [w]e similarly believe that the Management Guidelines' broad mandate to warn the public of 'special hazards' through educational materials, brochures, pamphlets, and the like necessarily encompasses an element of discretion in identifying such hazards [and] [b]ecause the NPS cannot apprise the public of every potential danger posed by every feature of the Park, a degree of judgment is required in order to determine which hazards require an explicit warning and which hazards speak for themselves."); Terbush, 516 F.3d at 1139 ("[T]he NPS's decision to close Glacier Point and the extent to which it later chose to warn about rockfalls at Glacier Point were discretionary judgments").

In the absence of any opposition to the granting of Defendant's motion, the Court agrees with Defendant that the reasoning of these cases applies equally to NPS decisions about whether to bar all access to the park during the federal shutdown, and therefore the discretionary function exemption immunizes the government and this Court lacks jurisdiction over the FTCA claim. The Court therefore recommends the Defendant's motion to dismiss under the FTCA's discretionary function exception be granted as well.

/ / /

**C.** **The Court Recommends Denying Leave to Amend and Dismissing this Action with Prejudice**

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," because "the court must remain guided by the underlying purpose of Rule 15 … to facilitate decisions on the merits, rather than on the pleadings or technicalities." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted).  Nevertheless, a district court need not grant leave to amend where the amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking amendment has acted in bad faith.  Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). "The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court." Id.

Plaintiff filed a statement of non-opposition to the granting of the 12(b)(1) motion brought for lack of jurisdiction, and made no mention of leave to amend therein, or whether this action should be dismissed with or without prejudice.  The Court's September 13, 2023, advising the parties that it would proceed in issuing these findings and recommendations unless otherwise advised of the status of the unopposed motion and this action, was not responded to by the Plaintiff.  That order specifically noted that the "[t]he Defendant's motion seeks to dismiss this action in its entirety for lack of jurisdiction, and that the notice of non-opposition did not address leave to amend or whether this action would be voluntarily dismissed for lack of jurisdiction. (ECF No. 16.)

"Ordinarily, a case dismissed for lack of subject matter jurisdiction should be dismissed without prejudice so that a plaintiff may reassert his claims in a competent court."  Frigard v. United States, 862 F.2d 201, 204 (9th Cir. 1988) (citation omitted).  "[H]owever, the bar of sovereign immunity is absolute: no other court has the power to hear the case." Id.  ("[N]or can the Frigards redraft their claims to avoid the exceptions to the FTCA [and] [t]hus, the district court did not abuse its discretion in dismissing the action with prejudice.").

Here, based on the contents of the motion to dismiss for lack of subject matter

1  jurisdiction, the contents of the notice of non-opposition, the Court's advisement order to the

2  parties and lack of response thereto, and the Court's analysis of the applicable law and facts

3  above, the Court finds Defendant's motion to dismiss should be granted, that Plaintiff should not

4  be granted leave to file an amended complaint, and that this action be dismissed with prejudice.

5  See Mace, 2015 WL 8770677, at *4 ("The court grants the United States' Rule 12(b)(1) motion

6  to dismiss the plaintiff's third claim for want of subject-matter jurisdiction [as] [t]he nature of

7  this analysis — the effect of the FTCA on the plaintiff's dangerous-condition claim — rules out

8  the possibility that the plaintiff could cure the jurisdictional defect by amending his claim [and]

9  [t]his dismissal is therefore with prejudice."); Burroughs v. United States, 610 F. App'x 697,

10  (Mem)–698 (9th Cir. 2015) ("Because the 'bar of sovereign immunity is absolute,' . . . the

11  United States cannot be liable under the doctrine of respondeat superior for the acts alleged [and

12  thus] [t]he district court therefore did not abuse its discretion by dismissing the action with

13  prejudice because the complaint cannot be redrafted to bring the respondeat superior claims

14  under the Federal Tort Claims Act." (quoting Frigard, 862 F.2d at 204)); Walker v. United

15  States, No. 1:02-CV-05801AWIGSAP, 2009 WL 3011626, at *6 (E.D. Cal. Sept. 17, 2009)

16  ("Here, further suit based on plaintiff's FTCA claim is forever barred under 28 U.S.C. § 2401(b),

17  because plaintiff failed to file suit within six months  . . . Plaintiff cannot amend the present

18  complaint to avoid the sovereign immunity bar, because amendment will not change the fact the

19  complaint was filed before the claim was denied . . . [t]he court may properly dismiss the FTCA

20  claims with prejudice." (citing Frigard, 862 F.2d at 204)); c.f. Braun v. U.S. Gov't, No. CV 13-

21  36-BU-DWM-JCL, 2013 WL 6577067, at *2 (D. Mont. Dec. 13, 2013) ("In light of Braun's

22  request, and because he has not alleged a basis for subject matter jurisdiction, dismissal without

23  prejudice    under    Rule    12(b)(1)    is    appropriate."); Smith v. Armstrong, No.

24  221CV00110KJMDMC, 2023 WL 199511, at *1 (E.D. Cal. Jan. 17, 2023) ("Unlike the Frigard

25  case cited by the magistrate judge, this case does not involve sovereign immunity that would bar

26  any claims plaintiffs may have against defendant.").

27  / / /

28  / / /

30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.**

**RECOMMENDATION**

For all of the above explained reasons, IT IS HEREBY RECOMMENDED that:

1.      Defendant's motion to dismiss this action (ECF No. 13) be GRANTED;

2.      Plaintiff's complaint be DISMISSED without leave to amend; and

3.      This action be DISMISSED with prejudice.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **fourteen (14) days** of service of these recommendations, any party may file written objections to the findings and recommendations with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The District Judge will review the Magistrate Judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **September 22, 2023**

UNITED STATES MAGISTRATE JUDGE